**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; Central States, Southeast and Southwest Areas Health and Welfare Fund; Employee Benefit Plans; and Howard McDougall, Trustee, Plaintiffs–Appellees,**

v.

**BEHNKE, INC., Defendant–Appellant.**

No. 88–1780.

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1989.

Decided Aug. 21, 1989.

Rehearing Denied Oct. 3, 1989.

**456**

Douglas A. Firth, Charles N. Taunt, Russell N. Luplow, P.C., Bloomfield Hills, Mich., Thomas C. Nyhan, Albert M. Madden (argued), Central States Law Dept., Chicago, Ill., for plaintiffs-appellees.

Craig H. Lubben (argued), Miller, Johnson, Snell & Cummiskey, Kalamazoo, Mich., for defendant-appellant.

Before JONES, WELLFORD and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Behnke, Inc., appeals the portion of the district court's judgment ordering it to pay delinquent health and welfare contributions to plaintiffs Central States, Southeast and Southwest Areas Pension Fund; Central States, Southeast and Southwest Areas Health and Welfare Fund; Employee Benefit Plans; and Howard McDougall, Trustee (Central States). Essentially, Behnke challenges the district court's interpretation and construction of various agreements between Behnke and its employees' bargaining agent, Local 34 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers (Union). Behnke urges that proper interpretation of these agreements relieves it of any payment obligation to Central States and deprives the district court of jurisdiction over the claim for the period beyond the expiration of the 1982–85 oral collective bargaining agreement (CBA) between Behnke and the Union. We conclude that the district court's order was premised on a proper interpretation and construction of the parties' agreements and, accordingly, affirm.

The facts underlying this case are undisputed. Behnke is a trucking firm based in Battle Creek, Michigan, that transports goods in interstate commerce. Central States is a multiemployer employee benefit fund within the meaning of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1002(1), (3), (37)A, as amended by the Multiemployer Pension Plan Amendments Act of 1980. As a multiemployer benefit fund, Central States receives contributions pursuant to collective bargaining agreements negotiated between employers and local unions affiliated with the International Brotherhood of Teamsters. Behnke contributed to Central States from 1950 to 1982 in accordance with a series of collective bargaining agreements with the Union. On March 31, 1982, the parties' then-existing three-year CBA expired and negotiations commenced for a new one. Meanwhile, Behnke and the Union agreed, on an interim basis, that Behnke would increase its contributions to Central States to maintain the same level of benefits for Behnke employees for the first year of the contemplated new CBA. Behnke also agreed to pay whatever was required to maintain the plan for the succeeding two years.[1] The parties' interim

---

1. The cost of preserving health and welfare benefits for year one of the anticipated CBA (from

agreement was memorialized in a writing, styled "Fringe Benefit Interim Agreement" (Interim Agreement). By its terms, this agreement was intended to provide benefit coverage to employees while negotiations for a new CBA proceeded. It became effective on April 1, 1982, and although it had an expiration date of April 1, 1985, it also provided for its earlier termination upon the execution, in final form, of the full CBA.

During the continuing CBA negotiations, Behnke expressed concern about the spiraling costs of providing its employees with health care benefits. In late 1982, the parties orally agreed on a new CBA, which was never reduced to writing or signed by the parties. Although Behnke had committed itself to paying increased premiums to Central States in year one (1982–83), the oral CBA between Behnke and the Union contemplated further negotiations regarding the manner, means, and method of providing health benefits in years two (1983–84) and three (1984–85) and regarding an appropriate insurance carrier. It also provided for a 5% pay raise in 1983 and in 1984, applicable in whole or part, at the employee's option, to wages or to increased premiums for health and welfare benefits.[2] Behnke's initial attempts to locate a new carrier to provide comparable benefits at lower rates were unsuccessful. In June 1983, negotiations between Behnke and the Union culminated in an agreement to apply the employees' 1983 5% raise to increased premiums necessary to retain health and welfare benefit coverage with Central States from April 1983 through March 1984. Accordingly, Behnke and the Union executed a "Participation Agreement." That agreement set forth the 1982–83 and 1983–84 contribution rates. More importantly, for our purposes, the agreement also stated that the 1984–85 contribution rate would be whatever rate was necessary to maintain the plan.[3] The Participation Agreement also binds Behnke to the Central States "Trust Agreement," which obligates Behnke to continue contributions in the amounts specified by the applicable CBA while negotiations proceed for a new CBA. The Participation Agreement also provides for its full force and effect until the employer notifies the fund by certified mail that it is no longer legally obliged to contribute to the fund. Accordingly, Behnke contributed to Central States, and benefits were paid by Central States through April 1984.[4]

In April 1984, Mark Behnke contacted Union representative Tom Harty regarding health benefits for 1984–85. Harty incorrectly advised Behnke that the Central States rate for health coverage would increase from $58.70 to $72.00. (The correct revised rate was $64.70, which equalled the scheduled 5% wage increase due employees under the oral CBA.) Behnke rejected this rate as too high and advised Harty of the company's intent to change health insurance carriers. Harty agreed to review a prospective new policy and to present it to Union members for consideration. Although the Union rejected the new policy in favor of Central States, Behnke changed carriers to the Travelers Insurance Company based on its reduced rates for comparable coverage. Accordingly, as of April 1984, Behnke discontinued its health and welfare contributions to Central States. On May 29, 1984, Behnke notified Central States by letter of its decision to discontinue its contributions because of prohibitively

April 1, 1982, through March 31, 1983) was $45.50 per week per employee. The rate increased to $58.70 and $64.70 respectively in the succeeding two years.

**2.** Employees were sent a letter dated September 30, 1982, advising them of the 5% increase and of Behnke's intent to provide retroactive coverage for any benefits denied as a consequence of Behnke's initial refusal to pay the increased premiums to Central States for coverage beginning in April 1982.

**3.** Although the Interim Agreement and the Participation Agreement were form agreements provided to the Union by Central States, no representative or agent of Central States took part in negotiations leading to the execution of these agreements by the Union and Behnke.

**4.** Central States did not send Behnke the customary "Notice of Acceptance" provided for in the Participation Agreement. Nevertheless, both parties deemed Behnke a plan participant.

high rates.[5] As of July 1984, Central States suspended benefits and payments for and on behalf of Behnke's employees and their dependents. Since May 1984, Behnke has maintained a comparable health and welfare benefits policy with Travelers.[6]

On July 5, 1985, the Union filed an unfair labor practice charge with the National Labor Relations Board (NLRB) against Behnke, in part because of its failure to negotiate over the change in health insurance carriers.[7] The NLRB issued a complaint on the charge but subsequently dismissed it at the Union's request after the parties adopted a new written CBA.[8]

Thereafter, Central States sued Behnke to recover delinquent contributions for the period from April 1, 1984, to November 1985. It sought delinquent pension and health and welfare contributions, together with liquidated damages, costs, and attorneys' fees[9] under ERISA. Jurisdiction was based on the Labor Management Relations Act, 29 U.S.C. § 185(a), and ERISA, 29 U.S.C. § 1132. Following a bench trial, the district court ordered Behnke to pay, among other damages, $139,831.70 in delinquent health and welfare contributions, interest, and liquidated damages.[10] It is this order that Behnke challenges on appeal.

## I.

As noted, the factual underpinnings of this case are not in dispute. What is disputed is the legal effect created by various agreements between the parties. Our standard of review of the interpretation and construction of these contractual agreements is *de novo*. *Carpenters Local Union No. 345 Health & Welfare Fund v. W.D. George Constr. Co.*, 792 F.2d 64 (6th Cir.1986) (citing *Weimer v. Kurz–Kasch, Inc.*, 773 F.2d 669, 671 (6th Cir.1985)).

Behnke first claims that its obligation to pay health and welfare insurance premiums to Central States pursuant to the terms of the Interim Agreement ceased when it reached a subsequent oral CBA with the Union that replaced the Interim Agreement. Next, Behnke urges that its obligation to continue its contributions pursuant to the Participation Agreement terminated when Behnke, by letter to Central States, effectively cancelled its participation because of Central States' high premiums. Behnke contends that its change of insurance carriers was authorized by and consistent with the oral CBA.

Behnke's claims hinge on the effect, under ERISA, of the 1982–85 oral CBA between Behnke and the Union because the terms of the employee benefit plan under the oral CBA conflict with the explicit written terms of the plan under the Interim, Participation, and Trust Agreements. That is, the oral CBA gave Behnke the option to change carriers in years two and three, while the written agreements commit Behnke to continue its contributions to Central States during, and potentially beyond, those years. The district court concluded that the written agreements determined the duration of Behnke's obligation to contribute to Central States and that, to the extent that the oral CBA limited that obligation, the oral CBA violated national policy and was legally unenforceable.

---

**5.** Although the Participation Agreement requires termination letters to be certified, the district court found that Behnke sent and Central States received Behnke's termination letter.

**6.** When the district court issued its opinion, Travelers had received and paid $23,309.76 worth of claims on behalf of Behnke employees.

**7.** Central States was not a party to the NLRB proceedings.

**8.** The oral CBA expired on April 1, 1985, via notice from Behnke to the Union and its international organization. Following negotiations, Behnke and the Union executed a new, written CBA effective November 2, 1985. That agree-

ment provides for health and welfare benefits through Travelers or any other carrier that could provided comparable benefits.

**9.** The present appeal is limited to the district court's order compelling Behnke to pay delinquent health and welfare contributions from April 1984 through November 1985.

**10.** Pursuant to 29 U.S.C. § 1132(g)(2), Behnke was also ordered to pay $6,736.08 in damages for delinquent pension contributions and liquidated damages, $26,716.55 in attorneys' fees, and post-judgment interest at the statutory rate.

Central States' trust funds have been established and are maintained in accordance with section 302 of the LMRA, 29 U.S.C. § 186, and sections 402 and 403 of ERISA, 29 U.S.C. §§ 1102 and 1103.

Section 302(a) of the LMRA, 29 U.S.C. § 186(a), prohibits an employer from contributing funds to various employee representatives. This general prohibition seeks "to prevent the misappropriation and dissipation of monies due the workers by union officials." *Merrimen v. Paul F. Rost Elec., Inc.*, 861 F.2d 135, 137 (6th Cir.1988) (quoting *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985)). This prohibition, however, is subject to certain exceptions. For example, section 302(c)(5)(B) of the LMRA provides the detailed basis by which payments may be made to and from a trust fund for the benefit of employees, and further provides that such payments must be made in accordance with a written agreement with the employer. 29 U.S.C. § 186(c)(5)(B). We recognized this principle in *Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1111 n. 16 (6th Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 147 (1987), in which we also noted that "the written agreement required by § 302 need not be a collective bargaining agreement as long as it sets out the employer's obligation to contribute." ERISA also requires every employee benefit plan to be established and maintained pursuant to a written instrument. 29 U.S.C. § 1102(a). Additionally, section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

The statutory duty imposed by this section likewise is not dependent on the existence of a collective bargaining agreement, as illustrated by the section's recognition that the obligation to contribute may arise "under the terms of the plan *or* under the terms of a collectively bargained agreement." *Id.* (emphasis added). The legislative history of ERISA reveals that its provisions authorizing remedies, 29 U.S.C. § 1132(g), for the serious problems created by delinquent employer contributions to multiemployer benefit plans were instituted to assure prompt payment of contributions and to facilitate recovery of costs incurred in recovering delinquencies. *Central States Southeast and Southwest Areas Pension Fund v. Alco Express Co.*, 522 F.Supp. 919 (E.D.Mich.1981).

In this case, Behnke and the Union had a written CBA pursuant to which Behnke was obliged to and did contribute to Central States, as it had done for the past thirty years. That agreement expired in 1982, and was eventually replaced in late 1982 by an oral CBA that Behnke contends excused its obligation to contribute to Central States from April 1984 through November 1985. Generally, we have no quarrel with the validity of an oral collective bargaining agreement. " '[A] collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound ... [a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement.' " *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 373 (7th Cir.1985) (footnote omitted) (quoting *Capitol–Husting Co. v. NLRB*, 671 F.2d 237, 243 (7th Cir.1982)).

■ The problem with Behnke's reliance on the oral CBA regarding its obligation to make contributions to Central States, however, is that the LMRA and ERISA require employer contributions to trust funds on behalf of employees to be pursuant to detailed *written* agreements specifying the employer's duty to contribute. *See McHugh v. Teamsters Pension Trust Fund*, 638 F.Supp. 1036 (E.D.Pa.1986) (Fund trustees not bound by alleged oral understandings between union and management; employer benefit plan agreements, by law, must be written and oral modifications or supplementations are invalid) (citing ERISA, 29 U.S.C. § 1102(a)(1),

and LMRA, 29 U.S.C. § 186(c)(5)(B)); *Straub v. Western Union Tel. Co.*, 851 F.2d 1262 (10th Cir.1988) (ERISA precludes oral modification). Accordingly, but for the other written agreements between Behnke and the Union, the provisions of the oral CBA providing for payments to Central States in year one and again, following negotiations with employees, in year two while reserving the right to negotiate the logistics and carrier for future (third-year) health and welfare payments, would be unenforceable as unwritten and in violation of the LMRA and ERISA.

■ Behnke and the Union did, however, execute two written agreements which, as discussed below, evidence Behnke's apparent intent and obligation to make payments to Central States from April 1984 until November 1985. These are the Interim Agreement and the Participation Agreement. The Participation Agreement incorporates by reference the Trust Agreement. Although these writings are not collective bargaining agreements, they sufficiently comport with the writing requirements of LMRA and ERISA at 29 U.S.C. § 186(c)(5)(B) and 29 U.S.C. § 1102(a)(1), respectively, to render Behnke's signed obligation enforceable as written. *See* 29 U.S.C. § 1145; *Gariup*, 777 F.2d at 375.

■ A pension or welfare trust is understood to be a third-party beneficiary of a CBA that receives contributions and issues payments negotiated by others. *Southwest Adm'rs Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987). The contribution and payout amounts and systems are predicated on the trust's receipt of full payment on behalf of covered employees, *Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988). In *Lynch*, the Seventh Circuit explained why trust funds are entitled to enforce employers' written obligations to contribute notwithstanding an employer's proffered defenses to that contractual obligation:

> Funds must assume that all participants in a plan are following the stated terms; no other approach permits accurate actuarial computations and proper decisions about which claims to pay. Just as the Federal Deposit Insurance Corp. is not bound by undisclosed promises of insured banks, so pension funds get the benefit of the written terms of agreements. Section 1145 of ERISA requires employers to make all pension contributions "not inconsistent with law". This language was added to ERISA "to simplify delinquency collection" by freeing pension and welfare funds from defenses that pertain to the unions' conduct. A claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit—although it might be a ground on which to obtain damages from the local union.

*Id.* at 333–34 (citations omitted). Moreover, in the recent case of *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989), the *en banc* court elaborated on why otherwise valid defenses to contract formation, such as fraud in the inducement, oral promises not to enforce written agreements, etc., cannot cut off the fund's claims:

> Multi-employer pension and welfare plans would be in a bind if ... flaws in the formation cut off third-party claims. Plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits. Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize—perhaps because employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract. If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised. *Lynch*, 836 F.2d at 333. Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must

spend. Litigation involving conversations between employers and local union officials—conversations to which plans are not privy—may be especially costly, and hold out especially great prospects of coming away empty-handed....

*Id.* at 1151.

■ In this case, there is no evidence that Behnke expressed its intent not to be bound by the literal terms of the Interim or Participation Agreements either in the agreements themselves or by notice to Central States prior to 1984. In fact, up until year three, Behnke's conduct complied with the explicit terms of these agreements.

The Interim Agreement, signed by Behnke, explicitly obligates Behnke to pay "w[ha]tever [rate] is required to maintain" health and welfare benefits for Local 34 effective April 1, 1984 (the third year of the contemplated new contract). The Agreement also provides:

> Whereas, the parties have begun to renegotiate their Collective Bargaining Agreement, and whereas, the parties have, in the course of their negotiations, agreed upon new contribution rates for certain fringe benefits to be paid on behalf of the bargaining unit covered by that agreement, and whereas, although a final copy of the new agreement is still being processed, the parties wish to implement those new fringe benefits immediately, now therefore, it is stipulated and agreed that this Fringe Benefit Interim Agreement shall be signed as a temporary agreement to permit and require the new fringe benefits while and until the full Collective Bargaining Agreement has been prepared and executed in final form.

Although Behnke claims that the Interim Agreement expired by its own terms when the new oral CBA was adopted, we are persuaded that a written CBA was contemplated. For one, the provision speaks of a "final copy" of the new CBA being processed, or being "prepared and executed in final form." Moreover, given the statutory requirements for employee benefit contribution plans to be written, it is reasonable to infer that a fully executed written CBA

was necessary to nullify the written Interim Agreement. Because no written CBA was executed until November 1985, the Interim Agreement remained in effect until its stated expiration date (4/1/85). Accordingly, the district court correctly determined that Behnke is liable to Central States for delinquent contributions from April 1, 1984 to April 1, 1985.

## II.

■ Parties to a collective bargaining agreement "may provide for rights which will survive termination of their collective bargaining relationship." *International Union, United Automobile, Aerospace, & Agriculture Workers v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Whether "benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties." *Id.* at 1479.

With this in mind, we are persuaded that Behnke extended its obligation to contribute to Central States until November 1985 by signing the Participation Agreement. Like the Interim Agreement, the Participation Agreement obligates Behnke to pay "whatever is required to maintain [the] present plan" for the third year (1984). Although this obligation would normally have ended when the third year ended (April 1, 1985), the Trust Agreement incorporated into the Participation Agreement extends the obligation. The Trust Agreement provides in pertinent part:

ARTICLE III. SECTION 1.

CONTRIBUTIONS AND COLLECTIONS

Amount of Contributions—Each Employer shall make continuing and prompt payments to the Trust Fund as required by the applicable collective bargaining agreement between the parties. *The obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated,* but such contributions shall not be required in case of strike

after contract termination unless the parties mutually agree otherwise.

(Emphasis added).

Notwithstanding the oral CBA, the obligation to contribute to Central States memorialized in the Interim, Participation, and Trust Agreements essentially was based on maintaining the same level of health and welfare benefits provided pursuant to the expired 1979–82 written CBA. Again, it is reasonable to infer that because ERISA requires employer contributions to an employee benefit plan to be made pursuant to a written instrument, the CBA contemplated in the Trust Agreement is a written and not an oral CBA. Accordingly, we conclude that, until the written CBA became effective in November 1985, a written CBA was still being negotiated for 1982–85 and that, therefore, Behnke's obligation to contribute extended beyond the third year of the contemplated 1982–85 agreement until November 1985 when a written CBA was finally executed. The Participation Agreement was executed on June 9, 1983, on the basis of the parties' arrival at an oral CBA for 1982–85 and contains repeated references to the parties' CBA. Although these references would seem to refer to the oral CBA that led to the signing of the Participation Agreement, there is absolutely no evidence in the Participation Agreement of any intent not to be bound by its terms in year three. Hence, even if Central States' conduct implicitly recognized the oral CBA, there is no evidence that the oral CBA intended anything other than what is reflected in the parties' Participation Agreement. The Participation Agreement contains no reference to any peripheral agreement between Behnke and the Union authorizing Behnke to seek and procure a less costly insurance carrier. Rather, Behnke agreed to pay whatever was required to maintain the plan. If Behnke intended otherwise, it should have reflected such intent in its written agreements as it did in the written CBA that took effect in November 1985.

### III.

■ Behnke also claims that it effectively terminated its obligation to contribute to Central States in its May 29, 1984, letter to Central States. That letter states:

Dear Sir:

I am writing on behalf of Behnke, Inc., Battle Creek, Michigan. Out [sic] Account number [is] 0715500–0109. Effective April 1, 1984, we were unable to continue with the Health and Welfare Policy in which you offer our employees; due to the substantial increase from $58.70 to somewhere close to $72.00 per employee per week. Our business has become very competitive and all of our customers could not accept an increase in our rates for services rendered.

If you have any further questions, please give me a call at my office as soon as possible. Thank you very much for your time and cooperation.

The termination provisions in the Participation Agreement provide:

This Agreement shall continue in full force and effect until such time as the Employer notifies the Fund(s) by certified mail (with a copy to the Local Union) that the Employer is no longer under a legal duty to make contributions to the Fund(s). The Employer shall set forth in the required written notice to the Fund(s) the specific basis upon which the Employer is relying in terminating its obligation to make contributions to the Fund(s). The Employer expressly agrees and hereby acknowledges by the signing of this Agreement that its obligation to make contributions to the Fund(s) shall continue until the above-mentioned written notice is received by the Fund(s) and the Trustees acknowledge the Employer's termination in writing.

Although it is not explicitly apparent in Behnke's termination letter, Behnke's termination of coverage was apparently premised on its perceived legal authority, pursuant to the oral CBA, to terminate contributions to Central States upon procuring comparable coverage at reduced rates from another carrier. The problem with this argument, however, is that, in view of the Interim and Participation Agreements, no legal basis existed for Behnke's termi-

nation of its obligation to contribute. Central States had never been apprised of any agreement between the Union and Behnke to negotiate over a change in carrier and was entitled to assume that Behnke was following the stated terms of the written plans.

In *Gerber Truck*, the proprietor of a trucking firm expanded his operation by acquiring another company's assets and hiring three of its drivers. The proprietor and the union representative for the three drivers at the former company signed various agreements obligating the proprietor to make pension and welfare contributions to Central States on behalf of all drivers, helpers, dockmen, and related employees. Despite these written agreements, the proprietor and union had orally agreed to limit the proprietor's contributions, and hence his obligations under the written agreements, to payments on behalf of the three drivers hired as part of his expansion. Hence, the oral understanding was that the signed documents would not be enforced as written. Instead, they would only be enforced to the extent necessary to enable the three drivers to preserve their former benefits. Central States was unaware of this oral understanding and, upon learning that the proprietor had eighteen additional employees apparently covered by the written agreements, sued for delinquent contributions. The *en banc* court held that, notwithstanding the oral understanding between the parties, the proprietor was liable for contributions for the eighteen covered employees in addition to the three acquired drivers until participation was properly terminated. In addition to the rationale previously noted, the court considered the legislative history to the 1980 multiemployer amendments to ERISA reflected in comments by managers of the legislation. Those comments indicate that delinquent contributions impose various costs on multiemployer pension and welfare plans that compromise the plans' ability to properly establish or meet funding standards and that impair the viability of the plans themselves. Compliant participants are saddled with the cost of delinquencies in the form of higher contribution rates and lower benefits. The comments expressed dissatisfaction with recourse available under prior law and announced a policy against employer repudiation of contribution promises. Hence, the amendments were intended to provide "a direct, unambiguous ERISA cause of action to a plan against a delinquent employer." *Id.* at 1153 (quoting 126 Cong.Rec. 23,039 (1980) (Rep. Thompson)). *See also Lynch*, 836 F.2d at 333; *Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315 (6th Cir. 1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2024, 85 L.Ed.2d 305 (1985) (employer could not rely on union shop clause in CBA or on union leader's representation that non-union employees were ineligible for benefits from union's health and welfare or pension trust funds when CBA provided for coverage for each employee covered by CBA; employer's estoppel arguments were unreasonable); *Waggoner v. Dallaire*, 649 F.2d 1362, 1365–66 (9th Cir.1981) (employer's claim that he entered into a CBA upon the oral understanding that the CBA's trust benefit terms would not be enforced rejected because, under the circumstances, federal law does not permit oral modifications of existing written agreements). Because the oral agreement between the Union and Behnke did not bind Central States, we agree with the district court that the termination notice was legally defective and that Behnke remained contractually obligated to contribute to Central States pursuant to the Interim, Participation, and Trust Agreements. Moreover, the writings evidencing Behnke's obligation to contribute to Central States after April 1984 are not at all ambiguous. Therefore, Behnke cannot introduce the oral CBA to evidence its intent not to be bound to contribute beyond April 1984. *See Musto v. American General Corp.*, 861 F.2d 897, 910 (6th Cir.1988) ("clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer"); *Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge,* 827 F.2d 1324 (9th Cir.1987) (employer and union cannot orally modify employee benefit plan provisions of CBA

and extrinsic evidence inadmissible to interpret unambiguous contract terms).

Behnke relies on *Cappa v. Wiseman,* 469 F.Supp. 437 (N.D.Cal.1979), *aff'd,* 659 F.2d 957 (9th Cir.1981), for the proposition that the scope of a written CBA can be modified by the parties' prior oral understandings that were not incorporated into the CBA. That case is distinguishable from this one in that the oral understandings in *Cappa* did not pertain to fringe benefit contributions and were not subject to the statutory protections applicable here. Even the *Cappa* court recognized that although CBAs need not be in writing, "[t]here do exist some circumstances ... in which national labor policy does require some form of writing. For example ... agreements which provide for pension fund contributions by an employer must be committed to writing. 29 U.S.C. § 186(c)(5)(B)." 469 F.Supp. at 442 n. 8.

■ As for Behnke's contention that the district court's order grants Central States a windfall given Central States' suspension of benefit coverage as of July 1984, the district court noted that Central States remains obligated to pay such benefits once the delinquency is corrected. Moreover, liability for delinquent contributions is not contingent upon there having been a payout on behalf of the covered employees. *See Kohn Beverage Co.,* 749 F.2d 315 (employer not entitled to credit for health and welfare contributions for terminated employees that remained on company payroll). Consequently, Behnke is liable for its delinquent contributions but the parties remain free to explore possible rights of indemnification.

### IV.

■ Finally, we reject Behnke's contention that the district court lacked jurisdiction to enforce Behnke's contribution obligations following the expiration of the oral CBA. We note that although federal courts lack jurisdiction to determine whether an employer's unilateral decision to refuse to make post-contract contributions

violates the National Labor Relations Act, 29 U.S.C. § 158(a)(5), they do have jurisdiction under ERISA, 29 U.S.C. §§ 1102, 1145, to enforce contractual obligations to contribute ("promised contributions") established by independent, unexpired trust and participation agreements, which, by their terms, extend beyond the expiration of a CBA. *Laborers Health & Welfare Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988); *see also Central States Southeast & Southwest Areas Pension Fund v. Ford Bros., Inc.,* 688 F.Supp. 316 (S.D.Ohio 1987) (jurisdiction over whether a practice that occurs after expiration of CBA constitutes an unfair labor practice lies with NLRB and not federal courts). Thus, because Central States' action for post-contract contributions arises from independent contractual promises reflected in the Interim, Participation, and Trust Agreements, jurisdiction was proper for the period from April through November 1985.

The district court's judgment is AFFIRMED in all respects.

WELLFORD, Circuit Judge, concurring and dissenting:

I reluctantly concur in the basic result reached despite my strong feeling that this result is both unjust and unreasonable. Behnke substituted one health and welfare carrier for another after notice to plaintiff because available rates for coverage were more economical. In my view, this switch in no way sacrificed the legitimate interests of its employee beneficiaries.[1] Behnke ought, at the very least, be given credit for the premiums paid to Travelers Insurance Company, or benefits paid to its employees by Travelers, during the period Central States suspended benefits and payments "for and on behalf of Behnke's employees." Behnke acted in apparent good faith reliance upon an oral CBA found to be unenforceable. It is scant comfort, under the circumstances, to hold Behnke liable for nearly $140,000 and to indicate that "the

1. The opinion of Judge Guy seems to concede that Central States was charging "prohibitively

high rates" for the "comparable" coverage and benefits obtained by Behnke at reduced rates.

parties remain free to explore possible rights of indemnification."

Had Behnke challenged the attorneys fees claimed, I would have directed a remand on this question because the district court made what appears to be an automatic award without any discussion of the reasonableness of the hours claimed and the appropriateness of the hourly amount.

I dissent from this court's failure to require that Behnke receive credit either for premiums paid by it to Travelers or for benefits paid to covered Behnke employees by Travelers during the pertinent period.