# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-3512

BRICKLAYERS LOCAL 21 OF ILLINOIS
APPRENTICESHIP AND TRAINING PROGRAM
and MASONRY INSTITUTE, BRICKLAYERS
LOCAL 21 PENSION FUND,

*Plaintiffs-Appellees*,

*v.*

BANNER RESTORATION, INCORPORATED,

*Defendant-Appellant*.

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 99 C 6633—**Martin C. Ashman**, *Magistrate Judge*.

_____

ARGUED MAY 28, 2004—DECIDED SEPTEMBER 22, 2004

_____

Before BAUER, RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The plaintiffs brought this action to compel an audit of Banner Restoration, Incorporated ("Banner") to determine ERISA compliance. Banner filed a counterclaim, seeking a refund of prior payments. After a bench trial, the district court ordered an audit and denied

Banner's counterclaim. Banner timely appealed. For the following reasons, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

The present dispute involves trust fund litigation to ensure that an employer has paid all required fringe benefit contributions. The employer, Banner, is an Illinois corporation that performs concrete and masonry restoration work. The plaintiff trust funds, collectively referred to as "the Funds," were established pursuant to a collective bargaining agreement ("the CBA") entered into by Illinois District Council No. 1 of the International Union of Bricklayers and Allied Craftsmen ("the Bricklayers") and various other parties.

Since 1991, Charles Ciancanelli has been the president of Banner. As president of Banner, Ciancanelli would call Bricklayer's Local 21 ("Local 21") or Local 21's Apprenticeship and Training Program, at least four times per year, to ascertain if any bricklayers were available to perform work. If bricklayers were available, they would be provided by Local 21.

On several occasions, Local 21 representatives visited Banner's work sites and insisted that Ciancanelli hire Local 21 members, pay union wages and make contributions to the Funds. Ciancanelli asserted that the representatives threatened "shut down" of the job sites or union picketing if Banner would not comply. On one occasion, Ciancanelli was asked to assume responsibility for the wage and benefit obligations of another employer working at the same job site

as Banner. Ciancanelli's son, Charles Ciancanelli, Jr., testified that representatives came to nearly ninety percent of Banner's work sites, demanding that Banner employ Local 21 members. Local 21 representatives also repeatedly requested that Ciancanelli sign the CBA on behalf of Banner, but Ciancanelli never did so.

Despite Ciancanelli's refusal to sign the CBA, Banner operated in a manner consistent with CBA obligations. In particular, from June 1991 through March 1998, Banner submitted monthly fringe benefit contributions and contribution reports to the Funds. The contribution reports noted the names and social security numbers of union and apprentice employees who performed regular and overtime work covered by the CBA. Some of the monthly reports contained the following language:

> I hereby certify that this is a true report of all hours worked by Bricklayers and Bricklayer Apprentices during the month and includes no self-employed persons. The undersigned agrees to the terms of payment to these funds set forth in the current applicable Collective Bargaining Agreement and to the terms of the applicable Trust Agreements, and that dues remitted to District Council #1 were deducted only from the paychecks of bricklayers and bricklayer apprentices who have authorized such deductions in writing.

R.40 at 2-3.[1] Ciancanelli signed the monthly contribution checks drawn on Banner's various accounts and submitted with the contribution reports. Banner's monthly contributions corresponded with the rates prescribed in memoranda sent by the Bricklayers to Banner and signatories of the CBA.

---

[1]  Not all monthly contribution reports contained this language. For a time, Banner submitted its own computer spreadsheets rather than the union-provided forms.

Those memoranda detailed the applicable annual wage and benefit rates required by the CBA.

Banner also remitted union dues on behalf of its employees to Local 21. Moreover, in February 1995, Banner cooperated in a payroll audit by the Funds pursuant to CBA terms. The audit covered April 1, 1992, through December 31, 1994. No delinquencies were found. In 1997, Ciancanelli donated a truck and driver to Local 21's Apprenticeship and Training Program. In May 1998, Local 21 notified Banner that it had failed to remit union dues for one employee, and Banner responded by sending the dues.

In 1997, 1998 and 1999, Banner was notified of hearings before the Joint Arbitration Board of the Bricklayers concerning charges of CBA violations brought by Bricklayers Local No. 14. After each of the three hearings, the Joint Arbitration Board found CBA violations at a job site in Romeoville, Illinois. After the 1999 hearing, the Joint Arbitration Board ordered Banner to pay damages to the Bricklayers. Banner did not challenge any of the Joint Arbitration Board's decisions, nor did it pay damages in accordance with the 1999 order.

In October 1999, the Funds filed this action seeking a compliance audit of Banner's payroll from January 1, 1995, to the present, alleging that Banner had failed to submit accurate monthly contribution reports and had failed to make required monthly contributions. Banner filed a counterclaim for a refund of the monthly contribution payments it previously had paid the Funds on the ground of mistake of fact or law.

## B. District Court Proceedings

The district court held a bench trial. The Funds entered into evidence agreed stipulations of fact and offered exhibits

submitted as part of the final pre-trial order; Banner additionally presented the testimony of Ciancanelli and Ciancanelli's son. The Ciancanellis testified that Banner complied with CBA obligations because of union coercion.

In its written findings of fact after the trial, the district court rejected, on credibility grounds, the Ciancanellis' version as to why Banner complied with CBA obligations:

> After review, this Court finds that Ciancanelli, as president of Defendant, did not perform any of the acts narrated above solely in response to Local 21's threats of work stoppages and pickets. This Court finds not credible Ciancanelli's testimony that, as president of Defendant, he sent in the contribution reports, paid union wages and fringe benefit contributions, etc., solely in response to Local 21's threats of work stoppages and pickets considering his demeanor and his son's demeanor at trial when testifying on the issue, and considering that he hired employees through Local 21, that Local 21 asked him to assume responsibility for the correct and timely payment of wages and fringe benefit contributions of another employer working at General Jones Armory, that he donated a truck and driver to Local 21's Apprenticeship and Training Program, and that he continued on his course of conduct for approximately seven years without complaining to any agency or similar authority, even in the face of three adverse decisions and an order to pay damages by the Joint Arbitration Board.

R.40 at 5-6 (footnotes omitted). The court thus rejected Banner's position that it paid monthly contributions only as a result of union coercion.

The court then determined that Banner had adopted the CBA through its course of conduct:

namely, its continuous submission of contribution re-
ports to Plaintiffs, its adherence to the wage and fringe
benefit contribution rates prescribed by the Collective
Bargaining Agreement when making such payments
and contributions, its practice of remitting union dues
on behalf of its employees to Local 21, and its complete
cooperation in the 1995 payroll audit, which revealed no
delinquencies.

R.40 at 8. Moreover, the court concluded that the contribu-
tions were made according to the terms of the written CBA,
thus satisfying the requirement of section 302(c)(5)(B) of the
Labor Management Relations Act ("the LMRA"), 29 U.S.C.
§ 186(c)(5)(B), that payments to employee representatives be
made only "as specified in a written agreement with the
employer." As a result, the court concluded that the Funds
were entitled to conduct an audit and that Banner was not
entitled to recoup any of the amounts paid to the Funds due
to mistake of fact or law. Banner timely appealed.[2]

## II

## ANALYSIS

### A.  Standard of Review

Banner brings a variety of legal and factual challenges to
the district court's decision. On appeal following a bench
trial, we review the district court's conclusions of law de

---

[2]  After Banner filed its notice of appeal, we ordered the parties
to file jurisdictional memoranda on the issue of whether the
district court had issued a final appealable judgment. Only
Banner responded to our order. Having reviewed Banner's sub-
mission and the supplements to the record, we conclude that the
district court did in fact issue a final order disposing of all claims
and that Banner's appeal is not premature.

novo and its findings of fact for clear error. *See Petrilli v. Drechsel*, 94 F.3d 325, 329 (7th Cir. 1996). "[O]ne who contends that a finding is clearly erroneous has an exceptionally heavy burden to carry on appeal." *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004). Additionally, a credibility determination " 'can virtually never be clear error.' " *Id.* (quoting *United States v. Archambault*, 62 F.3d 995, 999 (7th Cir. 1995)).

## B. Conduct Manifesting Intent To Be Bound

We begin with the well-established principle " 'that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound,' . . . rather '[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement.' " *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 373 (7th Cir. 1985) (quoting *Capitol-Husting Co. v. NLRB*, 671 F.2d 237, 243 (7th Cir. 1982)); *see also Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 500 n.2 (7th Cir. 1996); *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001); *Moriarty v. Larry G. Lewis Funeral Dirs. Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998); *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988).

Prior cases that have held an employer bound to a collective bargaining agreement as a result of conduct have emphasized, among other factors, the payment of union wages, the remission of union dues, the payment of fringe benefit contributions, the existence of other agreements evidencing assent and the submission of the employer to union jurisdiction, such as that created by grievance procedures. *See Robbins*, 836 F.2d at 332 (determining that an employer who promised to abide by but refused to sign a collective bargaining agreement adopted the agreement

when it paid the union scale, turned over dues under a checkoff system, negotiated grievances and made some pension and welfare contributions); *Gariup*, 777 F.2d at 376 (indicating that an employer became a party to the collective bargaining agreement when it signed an Assent of Participation form, returned unsigned Acceptance of Working Agreement forms, made contributions to the pension funds and paid wages at union rates); *Brown v. C. Volante Corp.*, 194 F.3d 351, 354-56 (2d Cir. 1999) (holding that conduct of an employer who did not sign two subsequent collective bargaining agreements but paid contributions and wages at the rates prescribed by those agreements manifested an intent to adopt the unsigned agreements); *see also Operating Eng'rs Local 139 Health Benefit Fund*, 258 F.3d at 650 (indicating that an employer's payment of contributions at the rate provided in a successor contract manifested acceptance). *But see Moglia v. Geoghegan*, 403 F.2d 110, 118 (2d Cir. 1968) (noting the presence of similar factors yet declining to find that employer adopted a collective bargaining agreement). Thus, in analyzing Banner's conduct for evidence of agreement to the CBA, the district court properly looked to these and similar factors.

To the extent that Banner challenges the district court's conclusion that, by its conduct, Banner manifested assent to the CBA, we decline to disturb the district court's judgment. We recognize, as did the district court, that Ciancanelli never signed the CBA on behalf of Banner. Our precedent makes clear, however, that a signature to a collective bargaining agreement is not a prerequisite to finding an employer bound to that agreement. *See Larry G. Lewis Funeral Dirs. Ltd.*, 150 F.3d at 777 ("[A] signature at the bottom of the collective bargaining agreement itself is unnecessary."); *see also Operating Eng'rs Local 139 Health Benefit Fund*, 258 F.3d at 650 ("Acceptance . . . can be manifested by conduct as well as by words.").

Other factors (to which Banner itself stipulated) demonstrate conduct manifesting assent to the terms of the CBA. For nearly seven years, Banner submitted monthly contribution reports to the Funds. In accordance with those reports, Banner paid fringe benefit contributions to the Funds. The contributions were made according to the rates prescribed by the CBA and were detailed in memoranda sent to signatories of the CBA (and to Banner). Some of the monthly contribution reports contained certification language indicating that the contributions were made pursuant to the obligations of the CBA.[3] Additionally, Banner remitted union dues on behalf of employees and paid wages at the

---

[3] The Funds suggest that "[o]n at least one occasion, Ciancanelli personally signed the monthly contribution report." Appellee's Br. at 18. However, they make this contention without record cite in violation of Rule 28(a)(9)(A) of the Federal Rules of Appellate Procedure, and, upon an independent review of the record, we did not discover any signed contribution reports.

The apparent absence of a signature to the certification language, despite the space provided for one, limits, to some degree, the significance of the certification language in this case. We also note, however, that checks signed by Ciancanelli were remitted with the reports. Together, we consider the certification language on the monthly reports and the accompanying payments as entitled to some weight in an analysis of whether Banner's conduct manifested intent to abide by the collective bargaining agreement. Compare *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001) (indicating that signed certification language on monthly remittance reports "was entitled to *some* weight . . . and maybe a lot" in considering whether employer was bound to a collective bargaining agreement) with *Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 668 (7th Cir. 2003) (concluding that, under the circumstances, signed certification language was evidence, but only "weak evidence," that employer considered collective bargaining agreement to be in effect).

rates prescribed by the CBA. It cooperated in an audit by the Funds in 1995. Moreover, about four times per year, Banner requested bricklayers from Local 21 or its Apprenticeship and Training Program.[4] It donated a truck to Local 21's training program. Finally, Banner took no action to challenge jurisdiction after the Joint Arbitration Board found it guilty of labor violation charges under the CBA brought by another Local in 1997, 1998 and 1999.

Before the district court, Banner attempted to minimize this objective evidence of intent to be bound, characterizing the seven-year course of conduct as the product of coercion. The district court rejected this explanation, largely on credibility grounds. It disbelieved the Ciancanellis' testimony that Banner paid union wages, remitted union dues, made fringe benefit contributions and repeatedly submitted to jurisdictional authority created by the CBA solely because union representatives threatened picketing. We see no reason to reject the court's credibility determination, especially given the degree of deference required by the standard of review.[5] *See Spurgin-Dienst*, 359 F.3d at 453.

---

[4]  Banner characterizes this factual finding of the district court as clearly erroneous. However, the finding corresponds directly with Agreed Stipulation No. 21:

> At least four to five times per year, Ciancanelli called either or both Local 21 and Local 21 Apprenticeship and Training Program to see if either had any apprentice bricklayers available for work. According to Ciancanelli, Local 21 and the Apprenticeship Program always were cooperative in providing bricklayers, if any were available.

R.50 at 6.

[5]  Banner invites us to reject the district court's credibility determination on the ground that it is contrary to the parties' agreed stipulations. In particular, Banner asserts that the parties stipu-
(continued...)

Nonetheless, even accepting the Ciancanellis' testimony, the Ciancanellis testified that the representatives of the union threatened picketing or "shut down" of jobs. We have indicated, however, that threats to strike do not nullify conduct manifesting assent to a collective bargaining agreement. In *Robbins*, an employer attempted to explain away its compliance with the terms of a collective bargaining agreement, partially on the ground that the union had threatened to strike. *See Robbins*, 836 F.2d at 332. We rejected this excuse:

> Lynch was bound, under the approach of *Gariup*. The threat to strike is unexceptional. Unions frequently de-

---

[5] (...continued) lated that "Ciancanelli . . . submitted the monthly contribution reports in response to threats . . . to shut his jobs down if he did not do so." Appellant's Br. at 17 n.10.

Banner's purposeful omission is misleading. Stipulation No. 29 actually reads:

> Ciancanelli *asserts* that he submitted the monthly contribution reports and contacted Local 21 and/or the Local 21 Apprenticeship and Training program for workers in response to threats by Local 21 representatives to shut his jobs down if he did not do so.

R.50 at 8 (emphasis added). Thus, Banner's complaint regarding the court's credibility determination rings hollow. That determination was consistent with the agreed stipulations and well within the district court's discretion.

We note further that Ciancanelli's assertion is not supported by objective evidence in the record. For instance, during the seven-year relationship, Banner never complained to an appropriate authority about the alleged acts of the union representatives, nor did it indicate, for instance, on its monthly contribution checks, that it paid the amounts only under protest. For this additional reason, we accept the district court's credibility determination.

> cline to work unless the employer adheres to a collective bargaining agreement. The threat of "no agreement, no work" hardly makes adherence to the agreement involuntary, as Lynch supposes. This is the threat, express or implied, of every contractual negotiation. (E.g., "Unless you pay my price, I won't sell you my iron ore.")

*Id.* at 333. As to the threats of picketing, we note that, during the seven years of allegedly coercive acts by the union, Banner never once complained to the National Labor Relations Board ("NLRB") or any other authority about the union's activities.

In sum, the district court was entitled to conclude that Banner's seven-year course of conduct manifested an intent to be bound to the terms of the CBA. Although Ciancanelli never signed the CBA, the company's regular monthly contributions, payment of union wages, remission of union dues, failure to challenge jurisdictional authority created by the CBA and other activities consistent with the conduct of a signatory constitute acceptance by performance.

## C.  "Written Agreement" Requirement

Having concluded that Banner's conduct manifested an intent to abide by the terms of the CBA, we next must consider whether Banner's monthly fringe benefit contributions comply with section 302(c)(5) of the LMRA. Section 302 of the LMRA generally forbids employer payments to representatives of employees. *See* 29 U.S.C. § 186(a). However, section 302(c)(5)(B) contains an exception for payments made in conformity with the terms "specified in a written

agreement with the employer." 29 U.S.C. § 186(c)(5)(B).[6] Banner argues that the payments it made to the Funds were not made under a "written agreement." On this basis, Banner seeks to avoid any present obligations to the Funds and, in its counterclaim, seeks a refund of the amounts previously paid in monthly contributions to the pension fund.

Section 302 of the LMRA ensures that payments to employee representatives are made for proper purposes. The Supreme Court has described the policy concerns that animate section 302:

> Those members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control.
>
> . . . .
>
> Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that

---

[6] 29 U.S.C. § 186(c) provides in relevant part:

The provisions of this section shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, That . . . (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer . . . .

such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain.

*Arroyo v. United States*, 359 U.S. 419, 425-26 (1959); *see also Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 961 (7th Cir. 2001) (quoting *Arroyo*, 359 U.S. at 425-26); *Gariup*, 777 F.2d at 375 (same). In *Gariup*, we ourselves explained:

> Congress required that a written agreement exist between the employer and the employees' representative governing the rights of employees on whose behalf the contributions were made to ensure "that employee benefit trust funds 'are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them.' "

*Gariup*, 777 F.2d at 375 (quoting *U.M.W.A. Health & Ret. Funds v. Robinson*, 455 U.S. 562, 570 (1982)). Mindful of these legislative purposes underlying the provision, we consider whether Banner's contribution obligations were "specified in a written agreement with the employer," as required by section 302(c)(5)(B). 29 U.S.C. § 186(c)(5)(B).

We begin with the proposition that "a signed, unexpired collective bargaining agreement between the parties is not required to satisfy section 302(c)(5)(B)." *Gariup*, 777 F.2d at 375; *see Moriarty v. Larry G. Lewis Funeral Dirs. Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998) ("[A] signature at the bottom of the collective bargaining agreement itself is unnecessary."); *see also Central States, Southeast & Southwest Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 460 (6th Cir. 1989) (indicating that an interim agreement and a participation agreement that incorporated a written trust agreement sufficiently comported with section 302(c)(5)(B)). Indeed, in some situations, even an "expired agreement—one that has no *contractual* force—nevertheless can satisfy the statutory requirements."

*Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 668 (7th Cir. 2003); *see also Alaska Trowel Trades Pension Fund v. Lopshire*, 103 F.3d 881, 883 (9th Cir. 1996) (indicating that a repudiated pre-hire agreement "provides a sufficient safeguard against the illegal payments § 302(c)(5)(B) is intended to prevent"); *Denver Metro. Ass'n of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers & Gas Fitters Local No. 3*, 586 F.2d 1367, 1373 (10th Cir. 1978) (indicating that an expired collective bargaining agreement and trust agreements incorporated therein satisfy section 302(c)(5)(B) (quoting *Hinson v. NLRB*, 428 F.2d 133, 139 (8th Cir. 1970))); *cf. NLRB v. Houston Bldg. Servs., Inc.*, 128 F.3d 860, 864-65 (5th Cir. 1997) (indicating that valid "make whole" remedy ordered by NLRB against successor employer who had not signed a collective bargaining agreement did not offend the policies behind section 302(c)). Thus, obligations have been enforced in a variety of circumstances, absent a signature to a current collective bargaining agreement.

Moreover, section 302(c)(5)(B) does not require a *signed* agreement;[7] it merely requires a "written" one. 29 U.S.C.

---

[7] We recognize that the existence of a signature to *some* document has been relevant in cases addressing whether an employer is bound to make fringe benefit contributions. *See, e.g., Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 376 (7th Cir. 1982) (citing employer's signature to Assent of Participation form which referenced the unsigned CBA); *Brown v. C. Volante Corp.*, 194 F.3d 351, 353 (2d Cir. 1999) (noting submission of signed contribution reports). Signatures in these cases are certainly relevant to establish the employers' assent to the terms of the agreements upon which they are found. *Cf. Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 606 (7th Cir. 2002) (indicating in the context of a collective bargaining agreement negotiated by a multi-employer association that "[s]igning the (continued...)

§ 186(c)(5)(B); *see Brown*, 194 F.3d at 355 ("Section 302(c)(5)(B) does not require that an agreement be signed, only that it be 'written' and set forth 'a detailed basis on which . . . payments are to be made' to a trust fund."); *Nat'l Leadburners Health & Welfare Fund v. O.G. Kelley & Co.*, 129 F.3d 372, 375 (6th Cir. 1997) ("The statute does not specify any signature requirement and the term 'written agreement' is unambiguous in relation to such.").[8] As our colleagues in

---

[7]  (...continued)
final agreement that has been negotiated certainly qualifies as conclusive evidence that the employer intended to be bound"). To the extent signatures are relevant for this purpose, we note Ciancanelli's signature to the monthly contribution checks remitted for nearly seven years. Nonetheless, we emphasize that section 302(c)(5)(B) of the LMRA itself imposes no signature requirement.

[8]  Both the Second and the Sixth Circuits have distinguished their prior case law on this issue. In *National Leadburners Health & Welfare Fund v. O.G. Kelley & Co.*, 129 F.3d 372 (6th Cir. 1997), the Sixth Circuit distinguished its prior decision in *Merrimen v. Paul F. Rost Electric, Inc.*, 861 F.2d 135 (6th Cir. 1988). In *Merrimen*, the court had found significant the absence of a signature to the CBA in the context of the section 302(c)(5)(B) analysis. *See id.* at 139. In that case, however, the CBA itself required a signature to a Letter of Assent in order to demonstrate acceptance of the CBA. *See id.* at 136; *see also Nat'l Leadburners Health & Welfare Fund*, 129 F.3d at 375 (emphasizing this fact). In *National Leadburners Health & Welfare Fund*, the Sixth Circuit distinguished *Merrimen* on that ground and clarified that *Merrimen* "does not impose a statutory signature requirement." *Id.* at 375. The court thus concluded that an employer could be bound by a collective bargaining agreement negotiated by a multi-employer association, despite the absence of that employer's signature to the agreement. *See id.* at 375-76.

(continued...)

the Sixth Circuit concluded: "[T]he statute is satisfied by a written agreement to which an employer is bound, not a written agreement to which an employer is bound which also carries that employer's signature." *Nat'l Leadburners Health & Welfare Fund*, 129 F.3d at 376.

In the present case, the parties do not dispute that the contributions made by Banner to the Funds were made in accordance with the terms of the written CBA negotiated by the Bricklayers, including Local No. 21. The record indicates that Banner paid the monthly contributions as directed by the memoranda it received; those memoranda detailed the wage and benefit rates required by the CBA. Additionally, the contribution reports submitted by Banner for a time, with its monthly contributions, also referenced the "terms of payment to these funds set forth in the current applicable Collective Bargaining Agreement" and "the terms of the applicable Trust Agreements." R.40 at 2-3.[9] Moreover,

---

[8] (...continued)

Similarly, in *Brown*, 194 F.3d at 351, the Second Circuit distinguished its prior decision in *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968). In *Moglia*, the court had relied partially on the fact that the collective bargaining agreement was unsigned. *See Moglia*, 403 F.2d at 114-15. In *Brown*, however, the court suggested that *Moglia* rested on the absence of conduct manifesting assent to the terms of the agreement. *See Brown*, 194 F.3d at 355 n.1. The court declared: "We did not . . . graft a signature requirement onto Section 302(c)(5)(B)." *Id.*

[9] The Funds invite us on appeal to rely upon the existence of the certification language on some of the monthly contribution reports as a writing sufficient to satisfy section 302(c)(5)(B). *See* Appellee's Br. at 17 ("[T]he language contained within the monthly contribution reports can and should suffice as a written agreement.").

(continued...)

Banner does not contend that the contributions have been credited to Funds for any improper purpose.

In this case, the existence of a "written agreement," albeit an unsigned one, detailing the terms upon which the fringe benefit contributions were to be made, and Banner's payment of contributions in accordance with that agreement, effectively concludes our inquiry. *See Brown*, 194 F.3d at 355 ("[A]n unsigned, written agreement satisfies Section 302(c)(5)(B)'s 'written agreement' requirement."). Under these particular circumstances, section 302(c)(5)(B) and the policy concerns behind that provision are met because the contributions were made as "specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). Banner cannot invoke section 302 of the LMRA as a loophole through which to

---

[9] (...continued)

We note for the sake of clarity, however, that section 302(c)(5)(B) requires that the "written agreement" specify the "detailed basis on which such payments are to be made." 29 U.S.C. § 186(c)(5)(B). Certification language, by itself, does not provide the specificity necessary to satisfy section 302(c)(5)(B). However, such certification language is significant, and may be sufficient, to the extent that it *incorporates* other written agreements with the employer— such as a collective bargaining agreement or trust agreements— which do set forth the "detailed basis" for payments as required by section 302(c)(5)(B). *See Guthart v. White*, 263 F.3d 1099, 1103 (9th Cir. 2001) ("Under the plain words of the statute, any written agreement with the employer can establish an employee's eligibility for Trust benefits, so long as it actually specifies, *directly or by incorporation*, 'the detailed basis' on which contributions are to be made." (emphasis added)); *see also Moriarty v. Larry G. Lewis Funeral Dirs. Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998) (suggesting significance of certification language); *Operating Eng'rs. Local 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001) (similar).

escape obligations to the Funds. *See Gariup*, 777 F.2d at 376 (concluding that the employer's "attempt to use the written agreement requirement of section 302(c)(5)(B) to circumvent its responsibilities under the collective bargaining agreement must fail").

Having reached this conclusion, we find no error in the district court's disposition of Banner's counterclaim. Banner's contributions were not made in violation of section 302(c)(5)(B) of the LMRA. Thus, Banner is not entitled to a return of its payments on that ground.

## Conclusion

We conclude that the district court properly ordered Banner to submit to an audit of its fringe benefit contributions and properly dismissed Banner's counterclaim. For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*