**Michael GARIUP, et al.,**
**Plaintiffs-Appellees,**

v.

**BIRCHLER CEILING & INTERIOR**
**COMPANY, INC.,**
**Defendant-Appellant.**

No. 84–2502.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1985.
Decided Nov. 18, 1985.

Pamela P. Kosenka, Stults, Custer, Kutansky & McClean, Gary, Ind., for defendant-appellant.

Stephen J. Feinberg, Asher, Pavalon, Gittler & Greenfield, Chicago, Ill., for plaintiffs-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and GARZA, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Birchler Ceiling & Interior Company ("BCI") appeals the decision of a magistrate for the United States District Court for the Northern District of Indiana finding that Birchler owed the Construction Workers Pension Trust Fund ("Fund") approximately $9,800 for delinquent contributions to the trust fund. We affirm.

I

The record reveals that BCI was incorporated under the laws of Indiana in January, 1979. Shortly thereafter, a representative of Local Union 81 of the Laborer's Interna-

* The Honorable Reynaldo G. Garza, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

tional Union of North America ("Union") sent several documents to BCI. The documents included (1) a copy of the Union's 1976–1979 collective bargaining agreement with the Associated General Contractors of Indiana, Inc.,[1] the multi-employer bargaining association, (2) a form entitled "Acceptance of Working Agreement" indicating that the signor adopted the Local 81's collective bargaining agreement with the employer's association, and (3) two "Assent of Participation" forms, both stating that the signor had agreed to contribute to the Fund. On May 23, 1979, Robert Birchler, the President of Birchler Ceiling Interior, shortly after employing two union workers, signed two Assent of Participation forms and returned them to the Union indicating BCI's intent to contribute to the Fund.[2] Robert Birchler also returned without signing the Union's Acceptance of Working Agreement form, and inserted his federal employer identification number on this form.[3]

BCI continued to employ the two union members until January 1983. During this period the Union negotiated successive collective bargaining agreements with the Associated General Contractors of Indiana, Inc., upon the expiration of the old agreements. The original 1976–1979 agreement, which expired on April 1, 1979, provided that contributions to the pension for each employee would be $.55 per hour while the 1979–1982[4] and 1982–1985 collective bargaining agreement provided for contributions to the pension fund at the rate of $.75

per hour per employee. From May 1979 until January 1981, BCI submitted contribution reports and payments to the pension fund based upon the contribution rates listed in the collective bargaining agreements. BCI ceased to make its contributions to the pension fund in February 1981 although it continued to employ the two union members until January 1983.

As a result of Birchler Ceiling Interior discontinuing its contributions to the Fund for the period of time from February 1981 to January 1983, the Fund filed suit in the district court to collect the delinquent contributions; and upon agreement of the parties the case was referred to the magistrate for trial. At trial, the executive secretary of BCI, Cecilia Sobierajski, testified that it was BCI's policy to comply with the terms of the collective bargaining agreement. Thus she would verify any increase in wages and benefits with the collective bargaining agreements and would then make the appropriate increases in the contributions to the Fund and adjust the employees' pay checks accordingly. Further Birchler testified that he executed the Assent of Participation form and complied with the terms of the collective bargaining agreements, stating that he did it "to satisfy the Union, you know, to whatever extent they wanted me to so that I could keep peace with them."

The magistrate found that "[b]ecause the collective bargaining agreements effective 1979–1982 and 1982–1985 were merely continuations of the earlier agreement ... and

---

1. BCI was not a member of this, or any other, employer bargaining group.

2. One form covered contribution to the Indiana State District Council Laborers and Hod Carriers Pension Fund and the other covered contributions to the Construction Workers Pension Fund. The form addressed to the "Trustees of the Construction Workers Pension Trust Fund—Lake County & Vicinity," states that "I ... have read a certain agreement, known as an 'Agreement and Declaration of Trust' entered into by the Laborer's Union ... # 81 ..." and "[i]t is my ... desire to participate and become a party in the same manner and form as any other participating employer...."

3. The Acceptance of Working Agreement provides that the "undersigned" has read and approved of the collective bargaining agreement, "effective from April 1, 1976 to March 31, 1979." Robert Birchler's name was only typed on this form on the line next to the word "By," indicating where the person was to sign the form. At trial Robert Birchler testified that he did not recall who filled in the information on the Acceptance of Working Agreement form.

4. The 1979–1982 collective bargaining agreement became effective on April 1, 1979, one month before BCI began contributing to the pension fund. This agreement provided that on October 1, 1979 the contribution to the Fund would increase to $.75.

because the defendant adopted these subsequent contracts through its course of conduct, the defendant was obligated to pay pension contributions at the rates specified in each of the contracts in effect at the time it employed laborers." The magistrate then totalled the hours the union employees worked during the period of February 1981 to January 1983, applied the $.75/hour pension contribution rate provided in the 1979–1982 and 1982–1985 collective bargaining agreements and determined that BCI's delinquency in payments to the Fund totaled $5,717. The magistrate also assessed a late charge for the delinquent contributions in the amount of $4,118 as provided for in the pension fund agreement.[5]

On appeal, BCI denies liability and contends it is not accountable for the delinquent contributions since BCI and the trustees of the Fund failed to comply with Section 302(c)(5)(B) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 186(c)(5)(B), requiring that the details of any payments made to any employee representatives be "specified in a written agreement with the employer." Birchler Ceiling Interior also alleges that the trustees failed to establish at trial that it was obligated to make contributions to the Construction Workers Pension Trust Fund as the collective bargaining agreements that it allegedly became a party to referred to a different pension fund, namely the Hod Carriers Pension Fund[6] and the trustees failed to

introduce any evidence of this fund's existence. Finally, BCI contends that the magistrate incorrectly determined the amount due the pension fund for the alleged delinquent payments.

## II

Before addressing BCI's argument that the Fund failed to comply with section 302(c)(5)(B), it is important to note that BCI does not challenge the magistrate's finding that it became a party to the collective bargaining agreements. It is "well established that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound," *Capitol-Husting Co., Inc. v. NLRB*, 671 F.2d 237, 243 (7th Cir.1982), rather "[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." *Id.;*[7] *see also NLRB v. Haberman Construction Co.*, 641 F.2d 351, 355–57 (5th Cir.1981); *Carpenters Amended & Restated Health Benefit Fund v. Holleman Construction Co.*, 751 F.2d 763, 770 (5th Cir.1985); *Trustees of Atlanta Iron Workers, Local 387 Pension Fund v. So. Stress Wire Corp.*, 724 F.2d 1458, 1459 (11th Cir. 1983).[8] For example, in *Trustees of Atlanta*, the Eleventh Circuit held that the employer, Southern Stress, had agreed to the collective bargaining agreement with the union through its course of conduct:

union's acceptance of the collective bargaining agreement. *Capitol-Husting Co., Inc.*, 671 F.2d at 243. The question presented to the magistrate in this case then was whether BCI's conduct was sufficient to find that it had ratified the 1976–1979, 1979–1982 and 1982–1985 collective bargaining agreements.

**8.** Indeed, it is the issue of whether a collective bargaining agreement exists binding BCI to make contributions to the Fund that vests jurisdiction in the district court to hear this case in the first instance. *See* 29 U.S.C. § 185(a); *see also Cement Masons Health & Welfare, etc. v. Kirkwood-Bly, Inc.*, 520 F.Supp. 942, 944 (N.D. Cal.1981). On appeal, BCI does not contest this court's jurisdiction to hear this case under 29 U.S.C. § 185(a).

---

**5.** Article VI paragraph 6.03 of the Restated Trust Agreement provides for a 2% per month fee on late contributions plus liquidated damages equaling 20% of the total amount due.

The parties stipulated that the Restated Trust Agreement, dated November 7, 1979, was an amendment to the Construction Workers Pension Trust Fund created by a trust agreement dated June 1, 1960. This trust agreement, created on June 1, 1960, is the agreement referred to in the Assent of Participation forms signed by Robert Birchler, president of BCI.

**6.** The Hod Carriers Pension Fund is another pension fund for construction workers in the northern district of Indiana.

**7.** In *Capitol-Husting Co., Inc.* our court held that although the union failed to expressly accept the employer's offer, its conduct following the making of the offer was sufficient to indicate the

"Southern Stress secured virtually all of its labor from the union hiring hall. Southern Stress's pay to its employees was in conformance with the pay scale established by the collective bargaining agreements. Southern Stress made fringe benefit reports and paid monies to and for the benefit of its employees to the trust fund for hospitalization benefits and frequently for other trust benefits. Trustees conducted at least two audits of Southern Stress's records...."

*Trustees of Atlanta,* 724 F.2d at 1460.

■ Similar to the holding of the court in *Trustees of Atlanta,* the magistrate in this case examined BCI's conduct and found that BCI agreed to the terms listed in collective bargaining agreements governing contributions to the Fund as follows:

"The defendant's execution of the Assent of Participation, its submission of the completed but unsigned Acceptance of Working Agreement, its immediate commencement of contribution reports and payments, and its payment of wages at the rate called for in the agreements, are all indicative of the defendant's intent to abide by the agreements. Further, defendant's purpose in adhering to the provisions of the agreements was to accept the benefits of the agreements, the maintenance of labor peace, strongly suggesting that the defendant expected by its actions it had become a party to the contract."

In the instant case, BCI signed the Assent to Participate form indicating its intent to contribute to the Fund. Further, BCI's conduct in returning the completed, yet unsigned, Acceptance of Working Agreement form to the Union with the employer's identification number entered thereon, indicates at least an intention on BCI's part to adopt the 1976–1979 collective bargaining agreement as only BCI and the Federal government had access to this identification number.[9] The magistrate also noted

that the "collective bargaining agreements effective 1979–1982 and 1982–1985 were merely a continuation of the earlier agreement with minor amendment thereto, including increased wages and fringed benefits, ..." Celia Sobierajski, BCI's executive secretary, testified that she verified the amounts listed in these agreements with the union. BCI then contributed to the pension fund for 1 and ½ years at the $.75 per hour/per employee amount listed in the agreements. Further, she testified that BCI paid its union employees' wages commensurate with those wages provided for in the 1979–1982 and 1982–1985 collective bargaining agreements respectively. The magistrate concluded that this conduct manifested an intention on the part of BCI to become a party to the agreements for that period of time when it employed the union members. Finally, Birchler, the President of BCI, testified that "[m]y intention was to satisfy the Union, you know, to whatever extent they wanted me to so that I could keep peace with them." (Tr. at 178). Thus, the magistrate determined that BCI had accepted the benefits of the labor contract and that through its course of conduct "the defendant expected that it had become a party to the contract."

In its defense, Birchler Ceiling Interior argues that the written agreement requirement of section 302 of the NLRA were not satisfied. BCI raised this issue before the magistrate, but the magistrate failed to address it in his opinion. Section 302(a) provides in part that "[i]t shall be unlawful for any employer or association of employers ... to pay, lend ... or agree to pay ... any money ... (1) to any representative of any of his employees." However, an exception to the rule prohibiting employer payments to employee representatives exists where, "the detailed basis on which such payments are to be made is specified in a written agreement with the employ-

9. Robert Birchler testified that he did not sign the Acceptance of Working Agreement form and that he did not recall who filled in the information on this form; however, the evidence demonstrates that BCI must have at least filled in

this number on the form since Birchler admitted that only BCI and the federal government had access to Birchler Ceiling Interior's federal employer identification number.

er...." Section 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B).

In *Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), the Court stated that Congress enacted section 302 because it was concerned "with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." *Id.* at 425–26, 79 S.Ct. at 868. In enacting section 302(c)(5)(B), "[t]he Congressional intent was to allow each employee to know and ... have a basis for enforcing his rights, and to eliminate discretion in union leaders to divert the funds." *Denver Metro Ass'n of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers and Gas Fitters Local No. 3 and Pipefitters Local No. 208,* 586 F.2d 1367 (10th Cir.1978) (*citing* 93 Cong.Rec. 4746–4747 (1947), comments of the late Senator Taft); *see also Bricklayers, etc., Union No. 15, Fla. v. Stuart Plaster Co.,* 512 F.2d 1017, 1025 (5th Cir. 1975). Thus, Congress required that a written agreement exist between the employer and the employees' representative governing the rights of employees on whose behalf the contributions were made to ensure "that employee benefit trust funds 'are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them.'" *U.M.W.A. Health and Retirement Funds v. Robinson,* 455 U.S. 562, 570, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982).

In this case, the trustees introduced in evidence a written trust agreement, written collective bargaining agreements detailing the amount to be contributed to the Fund (1976–1979, 1979–1982, 1982–1985), a written and signed Assent of Participation form and a completed yet unsigned Acceptance of Working Agreement form. In its brief, BCI simply argues that section 302(c)(5)(B) was not satisfied, but BCI fails to discuss its reasoning as to why any combination of these written documents would not satisfy that section's requirements. Thus, we can only surmise that the reason BCI believes the writing requirement of section 302(c)(5)(B) was not fulfilled in this case is because BCI never signed the collective bargaining agreements between the Union and the employers' association.[10] Our research reveals that a signed, unexpired collective bargaining agreement between the parties is not required to satisfy section 302(c)(5)(B); rather section 302(c)(5)(B) requires only a "written agreement," not a written collective bargaining agreement. *See Denver Metro Ass'n,* 586 F.2d at 1373 (written trust agreement is sufficient to satisfy "written agreement" requirement of section 302(c)(5)(B) where there is no current written collective bargaining agreement governing contributions to a trust fund); *see also Carter v. CMTA-Molders & Allied Health & Welfare Trust,* 736 F.2d 1310, 1313 (9th Cir.1984); *American Distributing Co., Inc. v. NLRB,* 715 F.2d 446, 451–52 (9th Cir.1983) (as long as there was a written agreement section 302 is satisfied); *Hinson v. NLRB,* 428 F.2d 133, 138–39 (8th Cir.1970).

Birchler Ceiling Interior argues that we should follow *Moglia v. Geoghegan,* 403 F.2d 110 (2d Cir.1968), *cert. denied,* 349 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969), which held that section 302(c)(5)(B) was not satisfied where the employer, while making contributions to the pension fund, failed to execute any type of written instrument evincing its intent to be bound by the trust agreement. We have no quarrel with the *Moglia* result; however, the facts in *Moglia* are not similar to the facts in this case. In *Moglia,* the court noted that the employer "had *never* entered into a collective bargaining agreement *or* a pension trust agreement ... although the Lo-

---

**10.** BCI neither disputes that a valid, legitimate written trust agreement does in fact exist detailing the rights of the employees and obligations of the Union and employer, *see Bricklayers, etc.,* *U. 15 Fla.,* 512 F.2d at 1026–27, nor contends that the trustees were somehow misusing the pension funds.

cal had often requested it to do so." *Moglia*, 403 F.2d at 114 (emphasis added). *Moglia* does not hold that a signed, unexpired collective bargaining agreement must exist to satisfy section 302; rather it was the absence of any "written agreement" that led the court in *Moglia* to determine that section 302(c)(5)(B) had not been satisfied. *Id.* at 116.

■ In the case before us, there was a "written agreement" that complied with the requirements of § 302(c)(5)(B) as BCI's President had signed a document entitled Assent of Participation which explicitly stated that BCI agreed to contribute to the Fund. This document, addressed to the "Trustees of the Construction Workers Pension Trust Fund—Lake County & Vicinity," states that "I ... have read a certain agreement, known as an 'Agreement and Declaration of Trust' entered into by the Laborer's Union ... # 81 ..." and "[i]t is my ... desire to participate and become a party in the same manner and form as any other participating employer...." The contributions to the Fund referred to in the Assent of Participation form were detailed in each of the collective bargaining agreements (1976–1979, 1979–1982, and 1982–1985). As previously noted, the district court determined that BCI had become a party to these agreements through its course of conduct:

"The defendant's execution of the Assent of Participation, its submission of the completed but unsigned Acceptance of Working Agreement, its immediate commencement of contribution reports and payments, and its payment of wages at the rate called for in the agreements, are all indicative of the defendant's intent to abide by the agreements. Further, defendant's purpose in adhering to the provisions of the agreements was to accept the benefits of the agreements the maintenance of labor peace, strongly suggesting that the defendant expected by its actions it had become a party to the contract."

Since a written agreement exists in this case that demonstrates BCI's intent to con-

tribute to the Fund, we hold that section 302(c)(5)(B)'s requirement of a "written agreement with the employer" was satisfied and thus BCI's attempt to use the written agreement requirement of section 302(c)(5)(B) to circumvent its responsibilities under the collective bargaining agreement must fail. We emphasize, however, that while BCI's signing the Assent of Participation form satisfied the "written agreement" requirement contained in section 302(c)(5)(B), this does not mean that BCI is forever obligated to contribute to the Fund. Rather, the extent of BCI's liability in this case is dependent upon whether BCI was a party to the collective bargaining agreements during the time it employed the union members. As previously discussed, Birchler Ceiling Interior did become a party to these agreements through its course of conduct when it signed the Assent of Participation form, returned the completed, yet unsigned Acceptance of Working Agreement form covering the 1976–1979 agreements, including in this form its federal identification number, and subsequently contributed to the Fund and paid its employees at the rates provided for in the labor contracts.

■ BCI next argues that the trustees failed to establish that BCI was obligated to make contributions to the Construction Workers Pension Fund Trust. To support this argument BCI refers to Article VIII of the 1976–1979 collective bargaining agreement that provides "the employer agrees to be bound by the Agreement and Declaration of Trust entered into and dated *June 1, 1962* establishing the Indiana State District Counsel of Laborers and Hod Carriers Pension Fund...." Birchler Ceiling Interior argues that if anything it was obligated to contribute to the Indiana State District Council of Laborers Hod Carriers Pension Fund, since this fund was referred to in Article VIII of the collective bargaining agreement, but the trustees failed to introduce any evidence at trial that the Hod Carriers Trust Fund did in fact exist. BCI's argument is without merit as the 1976–1979 (Article XXV) and 1979–1982

(Article XXVII) collective bargaining agreements both provide that hourly pension contributions for Local No. 81 "are to be paid into the Construction Worker's Pension Trust Fund . . . ," the Fund seeking recovery of monies in this case. Evidence was introduced at trial that established the Fund's existence, including the actual trust agreements along with the collective bargaining agreements and the Assent of Participation form, addressed to the Trustees of the Construction Worker Pension Trust Fund and executed by Birchler Ceiling Interior. Thus, BCI's argument that the plaintiffs failed to establish the existence of the pension trust fund is without merit.

Finally, BCI contends that if it is liable for the delinquent benefit payments, it should only be liable at the $.55 contribution rate specified in the 1976–1979 collective bargaining agreement and not at the $.75 contribution rate listed in the 1978–1982 and 1982–1985 agreements. As discussed throughout this opinion, Birchler Ceiling Interior bound itself to the terms of the collective bargaining agreement through its course of conduct. Thus, since BCI bound itself to these agreements during the time when it employed the union members, the magistrate properly applied the $.75 contribution rate in computing the damages. The magistrate also properly assessed interest and liquidated damages against BCI for the delinquent payments as provided in the Restated Pension Fund Agreement, dated November 7, 1979.[11] Section 6.03 of this agreement restates that portion of the ERISA statute which mandates that the district court shall assess interest and liquidated damages (in the amount of 20% of unpaid contributions) against the delinquent employer. 29 U.S.C. § 1132(g)(2)(B), (C).[12] Pursuant to 29 U.S.C. § 1132(g)(2)(D) this case is remanded to the district court for a determination of the amount of attorney fees to be awarded to the Fund for this appeal.

The decision of the district court is AFFIRMED.

---

11. This agreement was an amendment to the pension fund agreement dated May 5, 1960, which BCI expressly bound itself to when it executed the Assent of Participation form and returned it to the Union.

12. Section 1132(g)(2) provides:

"(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title [Delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan—
(A) the unpaid contributions,
(B) interest on the unpaid contributions,
(C) an amount equal to the greater of—
(i) interest on the unpaid contributions, or
(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent. . . . of the amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.
For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26."