**FLORIDA WEST COAST OPERATING ENGINEERS LOCAL 925 WELFARE FUND, et al., Plaintiffs,**

v.

**SUNBELT SALES & RENTALS, INC., Defendant.**

**No. 88–256–CIV–T–17C.**

United States District Court, M.D. Florida, Tampa Division.

March 1, 1990.

W. Eric Venable, W. Eric Venable, P.A., Tampa, Fla., for plaintiffs.

Thomas M. Gonzalez, Thompson, Sizemore and Gonzalez, P.A., Tampa, Fla., for defendant.

## MEMORANDUM OF DECISION

GARRITY, Senior District Judge.*

This is an action by the trustees of a multi-employer welfare benefit plan[1] to collect fringe benefits from the defendant Sunbelt Sales & Rentals, Inc. ("Sunbelt") for the months of June and July and the first three weeks of August 1986 pursuant to Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185, and sections 502 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132, 1145.[2] The plan of which plaintiffs are trustees and fiduciaries is a multi-employer employee welfare benefit plan under ERISA. Sunbelt is a business primarily engaged in the sale and rental of construction equipment, with operating personnel, to building contractors in the construction industry in Tampa and Orlando, Florida.

## FINDINGS OF FACT

(1) The material facts are virtually undis-

---

* Of the District of Massachusetts, sitting by designation.

1. Plaintiffs are also trustees of and sue on behalf of a related apprenticeship trust fund, whose claims have not been discussed explicitly in the parties' Joint Pre–Trial Statement filed November 9, 1989, presumably because controlled by identical principles. We follow suit.

2. In a counterclaim, the company sought a refund of contributions paid through May, 1986. Plaintiffs filed a motion to dismiss the counterclaim which we are granting by separate order and memorandum filed simultaneously with this one.

puted and are as follows.[3] Prior to November 15, 1985 the employees of Sims Crane Service, Inc. ("Sims") were union members covered by a local contract between the International Union of Operating Engineers Local 925 (hereinafter "Local 925") and Sims. On November 15, 1985, the defendant Sunbelt commenced operations at the former Sims location on 6429 Harney Road. In order to start its business operations, Sunbelt purchased the land, seventy percent (70%) of the cranes and certain operating equipment from Amca Finance, which had repossessed them from Sims.

(2) On November 18, 1985, Bryce M. Ashmore, business manager of Local 925, asked Sunbelt's president, Donald E. Granowicz, if he and his company would like to continue to do business with Local 925. Granowicz responded that he would not sign a contract, but that Sunbelt would employ the crane operators represented by Local 925 at the same wage rate and with the same fringe benefits as had been negotiated by Local 925 and Sims. As a reason for his refusal to sign a bargaining agreement, Granowicz told Ashmore that operations had not yet begun and it was unclear what Sunbelt's business needs would be.

(3) While Ashmore and Granowicz were talking, the crane operators gathered in the parking lot to await Ashmore's report. They had come to work that Monday morning unaware of Sunbelt's acquisition of Sims' land and equipment. Ashmore came to them, reported the essence of his discussion with Granowicz and told them that it would be OK for them to go to work for Sunbelt. The crane operators then went to Granowicz's office, at his invitation, where he repeated to them the assurances he had given to Ashmore, but stating also that the wage scale negotiated with Sims would be re-evaluated lated depending upon the course of operations. Thereupon, nineteen of the union operators and apprentices who

had previously been employed by Sims went to work for Sunbelt. But for Granowicz's assurances regarding wages and benefits, a number of these men would not have gone to work for Sunbelt.[4]

(4) On November 22, 1985 Granowicz addressed a letter to Bryce Ashmore of Local 925 and Ed Woodham of Local 673 which read as follows:

> As I have stated before, Sunbelt Sales and Rentals will pay the agreed to benefits & hourly wages that were negotiated by the two locals and Sims Crane when union operators run cranes owned by Sunbelt Sales and Rentals.

> I want to once again thank you both for your cooperation in this matter and I can assure you that we will use as many of your operators as possible when renting our cranes.

Local 925 did not sign the agreement nor did its business agent, Ashmore, make any promises or agree to do anything in return for the letter or for the promises contained therein.

(5) The benefits and hourly wages that were negotiated by the locals and Sims were set forth in articles 22 and 23 respectively of a multi-employer collective bargaining agreement between three operating engineers local unions and Florida Union Contractors and Sub-contractors Associations, Inc. Article 22 provided for benefit contributions of $1.655 for each hour worked, with allocations of $1.425 for the Welfare Fund, 18¢ for the Apprenticeship Trust Fund and 5¢ for a Contract Administration Fund. Article 22 was nine pages long and specified "the detailed basis on which such payments are to be made", as required by § 302(c)(5)(B) of the Taft–Hartley Act, as amended, 29 U.S.C. § 186(c)(5)(B). It also provided *inter alia* that contributions for a particular month

---

**3.** Section VII of the parties' Joint Pre–Trial Statement entitled "Facts Which Are Admitted" consists of 33 paragraphs of admitted facts. For purposes of this decision, we adopt as findings of fact, and rely upon, all of the facts stipulated therein. We do not, however, recite all of this in this memorandum, but only such as are essential to our decision.

**4.** The only direct evidence on this point came from Charles Sodders, a crane operator who testified without contradiction, that but for Granowicz's representations he would not have worked for Sunbelt. We infer that some other union members felt the same way.

need not be made until the 15th day of the following month. Article 23 was entitled "Wages" and computed total wages as comprising five components as follows:

Wages —
Health & Welfare —
Pension —
Apprenticeship —
Contract Administration Fund —
TOTAL —

Article 24 provided for the employers' checkoff for working assessments, i.e., deduction for union dues, of 2% of gross pay.

(6) For the months beginning November 1985 to and including May 1986, Sunbelt paid to the former Sims employees the wages set forth in Article 23 of the collective bargaining agreement and checked off and transmitted their union dues. When, in March 1986, the union negotiated a $1.00 hourly wage increase for crane operators with signatory contractors, Sunbelt paid it too. Sunbelt also used Local 925's hiring hall to obtain union operators and frequently discussed work assignments with representatives of Local 925. With respect to Article 22, Sunbelt filed monthly Employers Trust Account reports and made the welfare, apprentice and administration contributions specified in the collective bargaining agreement. A typical monthly report, for the first full month of defendant's operations, December 1985, showed Sunbelt contributing $4,546.28 to benefit funds, working assessments of $677.34 and a payment to the union's central pension fund in Washington, D.C. of $2,747.00.

(7) Each monthly report filed by Sunbelt contained the following printed legend immediately above the employer's authorized signature

**IMPORTANT NOTE:**

Contributions cannot be made on behalf of non-collective bargaining agreement personnel without a separate agreement with the Trust Fund to do so. In no event should contributions be made on behalf of sole proprietors or partners.

The Employer by payments of these contributions herewith acknowledges binding acceptance of the Agreements autho-

rizing receipt and disbursements by Trustees of the Employer contributions. Said employer further certifies that each hour reported herewith is for work performed by an employee on a project on which the sponsoring Union has majority support.

(8) Sunbelt made no contributions to the trust fund for June, July and three (3) weeks in August 1986 because of a series of events hereinafter described. During the spring of 1986, at about the time of the $1.00 hourly wage increase for crane operators, Granowicz and his assistant Strzelec had several discussions with Ashmore regarding work assignments for the union crane operators. Ashmore was constantly attempting to enlarge the area of their jurisdiction. On April 15, 1986, Granowicz issued a notice of operator classification at the Tampa site, which refined job classifications and clarified wages for certain job functions.[5] On June 27, 1986, Sunbelt sent Ashmore the following letter (the last paragraph is omitted because irrelevant):

Please allow this letter to constitute a formal request for bargaining between I.U.O.E. Local 925 and Sunbelt Sales & Rentals, Inc.

Up until this time, we have been working under the agreement between this company and the union as set forth in my letter of November 22, 1985, as amended with respect to wages by our subsequent conversations. We have now had sufficient time with the operation of this company to allow us to judge the needs of this company with respect to the wages, hours, terms and conditions of employment of those persons represented by your union. We therefore, notify you of our intention to negotiate changes with respect to our current November 22, 1985, as amended, agreement.

Local 925 did not reply to this letter.

(9) On July 15, 1986, Local 925 filed a Representation Petition with the National Labor Relations Board (NLRB) which sought to include in the represented unit

---

5. This notice, marked as exhibit B during Granowicz's deposition, was not offered in evidence at the trial. It was, however, described in defendant's pre-trial brief.

"all operators, oilers, mechanics and truck drivers employed" by "SUNBELT" at both its Tampa and Orlando operations. In this petition, Local 925 answered "None" in the boxes provided for the "Name of Recognized or Certified Bargaining Agent" and "Expiration Date of Current Contract, if any". Also, in connection with this or another NLRB hearing concerning two Sunbelt employees, business manager Ashmore and union attorney Frank Hamilton stated that Sunbelt had no agreement with Local 925. These statements and the petition's contents prompted the attorney for Sunbelt to advise Sunbelt that it was illegal for an employer to make contributions to a trust fund absent an agreement to do so. The defendant then took two steps: first, it declined to forward to the plaintiff trust fund in July, the contributions based upon wages paid to its union crane operator employees during the month of June; and second, on July 23, 1986, it wrote the letter set forth in the next paragraph. For the same reason, it made no contributions to the plaintiff trust fund, nor to the central pension fund, nor to the joint apprenticeship training fund, geared to wages paid during July, nor for the first three weeks in August.[6]

(10) On July 23, 1986, president Granowicz wrote a letter which, at some unspecified time, was inserted into the payroll envelopes of some of Sunbelt's employees. This letter read, in pertinent part, as follows:

> Frank Hamilton, the Operating Engineers Lawyer, has told us we do not have an agreement with Local 925. We can no longer pay into Local 925 because federal law makes it a crime for Sunbelt to pay your fringes to the Union Trust Account due to the stand by your union.
>
> We can continue to pay two percent into Local 925 that goes to run the union if you want, but you must sign an authorization card that you can get from the

hall and give it to us in order that we can do so.

> We continue to try and work with your business agent Bryce Ashmore but are unable to do so because of his adversary positions. We are repeatedly put on the defensive because of filings by Local 925 with the Labor Relations Board.
>
> Sunbelt will automatically pay you Twelve Dollars and 50/100 ($12.50) per hour for crane work and put you on our insurance benefits until we work out an agreement. We want you to work! We want to work out an agreement, but to date, Bryce Ashmore and Frank Hamilton will not meet with us.
>
> Thus far we have paid *full* benefits of over $43,000.00 into Local 925 on your behalf and we are *current*. We did this because we thought we had an understanding with Local 925 but your representatives are now saying we do not.

(11) Sunbelt did not send a copy of the July 23, 1986 letter to Local 925 or to the plaintiff trust fund. Nor did it advise Local 925 that it was suspending contributions to the trust fund relating to wages paid from and after June 1, 1986. Consequently, the plaintiff trust fund continued to pay medical benefits on behalf of Sunbelt employees for whom contributions had previously been made, in anticipation that contributions would be forthcoming. With respect to Sunbelt's statement in the letter inserted into payroll envelopes that it would, "put you on our insurance benefits until we work out an agreement", it never did so.

### ISSUES PRESENTED

Pursuant to Local Rule 3.06 requiring the filing of a pre-trial stipulation that "will control the course of the trial", the parties filed a joint pre-trial statement, whose statement of the issues is as follows:

---

**6.** On August 25, 1986, Sunbelt and Local 925 entered into a Recognition Agreement which provided for trust and pension fund contributions to be made during the pendency of negoti-ations between the parties. Hence, fund contributions resumed beginning with the fourth week of August, 1986.

**1140**

## IX

### STATEMENT OF THOSE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED[7]

Whether an enforceable contract existed and, if so, whether the acts of the Defendant gave reasonable notice to the Plaintiffs that Defendant had repudiated the at-will agreement.

## X

### ISSUES OF LAW WHICH REMAIN FOR DETERMINATION

1. Whether an enforceable contract existed and, if so, whether the acts of the Defendant gave reasonable notice to the Plaintiffs that Defendant had repudiated the at-will agreement.
2. Whether liquidated damages, interest, costs and attorneys' fees are due from Defendant.

During the trial, an additional issue of law emerged, viz, compliance with the "written basis" requirements of § 302(c)(5)(B) of the Taft–Hartley Act, 29 U.S.C. § 186(c)(5)(B). Upon conclusion of the trial, the Court invited the parties to file post-trial memoranda of law on this issue and they have done so.

### CONCLUSIONS OF LAW

Before addressing directly the issues presented by the litigants, a variety of preliminary points should be noted. The first is that the plaintiff in this case is not the union, but rather the Welfare Fund and its trustees. This fact was often overlooked in briefs filed by the defendant company. Secondly, this litigation may well be the consequence of a poor choice of words by Local 925's attorney and business agent in stating that no contract existed between the union and Sunbelt, thereby triggering the advice by Sunbelt's attorney that benefit contributions could not legally be made under ERISA absent an agreement. Although the evidence was insufficient to support a finding of fact to this effect, what Hamilton and Ashmore were proba-

bly referring to was a formal collective bargaining agreement. Probably they were not referring to every sort of agreement; in particular, to the relatively narrow agreement reached in November 1985 and continuously implemented thereafter and acknowledged repeatedly by Sunbelt, especially in Granowicz's letter dated June 27, 1986. Nevertheless, the surrounding legal issues have been thoroughly developed and presented and must be resolved.

The nature of benefit fund contributions should also be noted. They are not wholly separate and distinct from wages in the strict sense of that word, but part of a compensation package earned by employees. This linkage between the two was indicated in the defendant's November 22, 1985 letter to Local 925 when it used the phrase "benefits & hourly wages". The relationship is explicit in Article 23 of the multi-employer collective bargaining agreement which lists with respect to each job classification total wages comprising five components including both ordinary wages, i.e., take home pay after tax deductions, and benefit contributions.

### THE CONTRACT

■ In considering the defendant's central position, viz, that any contract between Local 925 and Sunbelt was illusory, we first state our opinion as to what the contract was not. It was not a collective bargaining agreement with such an agreement's comprehensive prescriptions of the obligations and responsibilities of the parties. Nor, in our opinion, despite the tacit and sometimes explicit assumption by counsel in the instant case, was the parties' understanding a prehire agreement so as to make controlling the principles enunciated in *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983). Such agreements, authorized by § 8(f) of the National Labor Relations Act, appear to require incorporation or adoption by reference of a customary collective bargaining agreement or at least an agreement broad-

---

7. These same issues were framed by Judge Kovachevich in her order denying summary judg-

ment entered July 6, 1989.

er than that which was reached between Local 925 and Sunbelt. Also, parenthetically, the decisions construing prehire agreements focus upon whether the union has attained majority status, a question not involved in the instant case.

There can be no doubt in this case that Local 925 and Sunbelt thought that an agreement existed between them and that they acted accordingly. Sunbelt made the benefit contributions provided by the multiemployer plan. Granowicz's formal request for bargaining dated June 27, 1986 stated that "we have been working under the agreement ... as amended" and we "notify you of our intention to negotiate changes". Only the imprecise remarks of Ashmore and Hamilton in connection with an unrelated NLRB hearing and the "None" responses in the union's representation petition dated July 15, 1986 caused Sunbelt to conclude, on the advice of counsel, that their agreement was a nullity.

In urging that any contract between Local 925 and Sunbelt was illusory, the defendant relies heavily on its contention that the November 22, 1985 letter is the agreement between the parties. However, although that letter is important because it evidences that an agreement existed, it is not itself the agreement. The letter states that defendant "will pay the agreed to benefits"—that is, the benefits that were agreed to by defendant's predecessor, Sims, and the locals. The letter does not state what those benefits are, so the letter must contemplate that some other document will supply that information. And, of course, the document that supplies the missing information is the collective bargaining agreement between the locals and Sims.

Taken together, the November 22, 1985 letter and Articles 22 and 23 of the multiemployer agreement constitute a binding contract between Local 925 and Sunbelt, at least to the extent of obligating Sunbelt to pay wages to employees and welfare benefits on their behalf for hours worked. The starting line in cases like this must be § 515 of the Act which provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law make such contributions in accordance with the terms and conditions of such plan or such agreement.

This statute does not insist upon a plan or collective bargaining agreement, but rather on "a collectively bargained agreement". In the instant case, the agreement between Local 925 and Sunbelt was a collectively bargained one, made on behalf of the union members by their business manager.

*Trustees of Atlanta v. Southern Stress Wire Corp.*, 724 F.2d 1458 (11th Cir.1983) concerned the enforceability of a prehire agreement and is distinguishable on that basis. However, the legal principles set forth in the opinion of the Court of Appeals are equally applicable here, as follows:

> In reviewing this finding, we note that federal courts have liberally applied contract law in determining whether an enforceable labor agreement exists. [citations omitted] Further, a union and employer's adoption of a pre-hire contract is not dependent on its reduction to writing [citation omitted]. Instead, conduct manifesting an intention to abide by the terms of an agreement is required.

No less than the employer's in the *Southern Stress Wire* case, Sunbelt's conduct in this case manifested its intention to abide by the November 1985 agreement. It paid the precise wages computed in Article 23 and the various welfare, pension and other benefits contributions prescribed by Article 22. It filed complex monthly reports with the trust fund trustees.

Defendant has argued that the November 1985 agreement lacked consideration in the form of mutuality of obligation because Local 925 made no promises in exchange for Sunbelt's promises regarding wages & benefits and its assurance that it would use as many of Local 925's operators as possible. Plaintiffs have suggested conduct by Local 925 sufficient to afford consideration. For example, on November 22, Ashmore encouraged the members of Local 925 to go

**1142**

to work for Sunbelt and thereafter, the union made its hiring hall lists available to Sunbelt and discussed work assignments and conditions. In these respects, plaintiffs submit, Sunbelt obtained from the union important benefits of collective bargaining.[8] Be that as it may, the court need not rest its finding of a binding contract upon traditional principles of contract law. As stated in *Central States v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1149 (7th Cir. 1989),

> The pension or welfare fund is like a holder in due course in commercial law [citation omitted], or like the receiver of a failed bank [citation omitted]—entitled to enforce the writing without regard to understandings or defenses applicable to the original parties.

The force of this rule is well illustrated in *Trustees of Laborer's Local Union 800 v. Pump House*, 821 F.2d 566 (11th Cir.1987), which held that the defense of fraud in the inducement is unavailable as a defense to an action by employee benefit fund trustees to collect delinquent contributions. In our opinion, any flaw under traditional contract law in the formation of the agreement between Local 925 and Sunbelt pales in comparison to the defense of fraud in the inducement raised as an affirmative defense by the employer in the *Pump House* case.

In the instant case, both parties entered into their agreement in complete good faith. Their agreement was strictly a continuation of key provisions of the collective bargaining agreement which was in effect until the very day Sunbelt succeeded to the major portion of Sims' business. The sections to which the November 22 letter related were not of secondary or transitory concern, but were of surpassing importance and were utilized on a daily and monthly basis by Sunbelt and by the plaintiff trustees. Whether the defendant's ces-

sation of benefits contributions violated this contract, which plaintiffs concede was terminable at will, we consider next.

## ITS DURATION

■ Whether Sunbelt's suspension of benefits contributions, based upon wages paid during the eleven week period from June 1 until August 25, 1986, violated its contract with Local 925 depends on the duration of that contract. If it continued in existence and effect during this period, defendant is liable under ERISA, subject to the "written basis" requirement of § 302(c)(5)(B) discussed below. The dispositive question in this regard, framed and argued by the parties, is whether Sunbelt's acts gave reasonable notice to the plaintiffs that the defendant had repudiated the at-will agreement.[9] We hold that they did not.

The applicable standard of such repudiation is found in two 11th Circuit cases relied upon by both parties, *Local Union 72 v. John Payne Co., Inc.*, 850 F.2d 1535 (11th Cir.1988) and *Local 92 v. B & B Steel Erectors Inc.*, 850 F.2d 1551 (11th Cir. 1988). Quoting from *Payne*,

> [1] It is has been held that "[a] mere breach of contract will not suffice to establish repudiation [of a prehire agreement]." *Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v. Harkins Construction & Equipment Company, Inc.*, 733 F.2d 1321, 1327 (8th Cir.1984). However, an employer's conduct, if "sufficiently bald and open" or "open and notorious" so as to give a union notice of its intent to repudiate, can achieve that same result.

Although both decisions concerned repudiation of § 8(f) prehire agreements under 29 U.S.C. § 158(f) neither party has seen any significance to this distinction and neither do we. Section 8(f) applies to employers

---

**8.** Compare Article 2 of the multi-employer agreement which is entitled "Purposes" and recites several benefits flowing to each signatory, the first of which is "to provide employers with a source of workmen at agreed wage scales" and another, "to provide stability and the enjoyment of harmonious relations to said parties".

**9.** The wording of this stipulated issue could be misleading because plaintiffs in this case are the Trust Fund trustees. The defendant has not suggested that it gave notice to them, but rather to Local 925. This latter question is the one explicated in the cases and litigated by the parties.

like Sunbelt who are engaged primarily in the building and construction industry and the test stated in the *Payne* and *B & B* cases is of general applicability. In the former, the employer's attorney wrote an unqualified letter of repudiation to the business manager of the plaintiff union. In the latter, the employer closed its operations and notified the union that it was going out of business.

In the instant case, Sunbelt's acts were not sufficient to give Local 925 notice of its intention to repudiate the November 1985 agreement and its concomitant obligation to make benefit contributions to the plaintiff Trust Fund. The June 27, 1986 letter to Ashmore, far from repudiating the agreement, reaffirms it and states Sunbelt's intention to negotiate changes in it. The July 23, 1986 letter was inserted into the payroll envelopes of some employees,[10] but was not sent either to the union or to the plaintiffs. Also, the letter itself reads more like a grievance than a repudiation, professing Sunbelt's obvious unwillingness to commit a crime under federal law and its desire to work out an agreement if only the union representatives would meet with Sunbelt. Finally, the negotiating and maneuvering relationship between the parties seems to have continued during the summer of 1986 because, contrary to the spirit of repudiation, the parties entered into a recognition agreement on August 25, 1986 which reinstated the identical benefits contributions which were suspended in July retroactive to June 1, 1986.

It has been noted *ante* that plaintiffs remained in the dark regarding the defendant's activities and continued to pay medical and dental benefits to employees whose coverage plaintiffs had no reason to suspect had been suspended.

## SECTION 302(c)(5)(B) REQUIREMENT

■ Section 302(c)(5)(B) of the Taft–Hartley Act, 29 U.S.C. § 186(c)(5)(B) prohibits employers from contributing to employee groups except when the payment is made pursuant to a detailed written agreement setting forth the basis for the payments.[11] Section 302 is structured "to insure that employer contributions are made only for proper purposes and that fund benefits reach only proper parties." *Bricklayers Local 15 v. Stuart Plastering Co.,* 512 F.2d 1017, 1025 (5th Cir.1975). *See also: Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959). Defendant contends that the payments sought by plaintiff are illegal because they are not based on a detailed written agreement. In support of this contention, defendant points to the insufficiency of the November 22 letter to meet the section 302 requirement.

While the court agrees that the November 22 letter, standing alone, does not meet the Section 302(c)(5)(B) requirement, the court does not agree that the letter stands alone. The letter adopts the terms of the Sims collective bargaining agreement as they pertain to benefits and hourly wages. Turning to the provisions governing the payment of benefits in the Sims agreement, we find nine pages devoted to detailing the basis for the employer's contributions.

Defendant concedes that an agreement that does not itself satisfy Section

---

**10.** The evidence on this point left much to be desired. It did not indicate to how many of the employees the letter was delivered nor when.

**11.** Payments to employee groups are prohibited except:

(5) With respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That ... (B) the detailed basis on which such payments are to be made

is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employee may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute ... and [such agreement] shall also contain provisions for an annual audit of the trust fund ... 29 U.S.C. § 186(c)(5)(B).

302(c)(5)(B) may nevertheless pass muster by incorporating by reference another document that contains the requisite specificity. *See Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985); *Bricklayers Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1028–29 (5th Cir.1975).

*Rosen* and *Stuart* stand for the proposition that if a bargaining contract fails to meet section 302(c)(5)(B)'s specificity requirement, it can be saved if it incorporates by reference the relevant trust agreement and that trust agreement independently satisfies section 302(b)(5)(B). However, those cases do not hold, as defendant would have us believe, that incorporation by reference of a trust agreement is the only way to satisfy section 302(c)(5)(B) in the absence of a satisfactory collective bargaining agreement. Here, plaintiff is not attempting to enforce a collective bargaining agreement, nor does plaintiff rely on a trust agreement or even on a theory of incorporation by reference. Thus, defendant's exclusive reliance on *Rosen* and *Stuart* is misplaced.

The terms of Section 302(c)(5)(B) require a written agreement, but they do not mandate that agreement be a formal collective bargaining agreement. In holding that the section 302(c)(5)(B) specificity requirement was met by defendant's signed adoption of the relevant portions of the Sims agreement, we are supported by the section's purpose as well as by similar holdings. *See Trustees of Atlanta Iron Workers v. Southern Stress Wire Corp.*, *supra* (through its conduct, employer adopted a collective bargaining agreement, thereby binding itself to the fringe benefits trust); *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370 (7th Cir.1985) (§ 302(c)(5)(B) satisfied by signed Assent of Participation referring to unsigned collective bargaining agreement); *Central States v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1154 (7th Cir.1989) (agreement for purposes of § 302(c)(5)(B) need not be a formal collective bargaining agreement); *Griesmann v. Chemical Leamon Tank Lines, Inc.*, 776

F.2d 66, 71 (3d Cir.1985) (labor agreement is a binding contract even though not a collective bargaining agreement). *But see Merrimen v. Paul F. Rost Elec., Inc.*, 861 F.2d 135 (6th Cir.1988) (voluntary contributions do not bind employer to continue payments in absence of signed agreement).

## THE REMEDY

Plaintiffs' position on the three liability issues having been accepted by the court,[12] judgment will be awarded in favor of the plaintiff Trust Fund and trustees in an amount as yet undetermined. At the trial, plaintiffs filed an exhibit showing omitted contributions, plus 2% dues checkoff, for the eleven weeks in question totalling approximately $22,500. Under ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2), prevailing plaintiffs shall also be awarded interest or, under certain circumstances, liquidated damages and reasonable attorney's fees and costs. The parties are requested to stipulate these amounts and the total amount of the judgment. Failing stipulation, they shall file, as soon as practicable, appropriate supplemental pleadings and the case will be returned to Judge Kovachevich for consideration and decision of those matters.

## ORDER AND MEMORANDUM DISMISSING COUNTERCLAIM

■ During the trial of this case without jury, the court entertained and heard argument on plaintiffs' motion to dismiss a counterclaim by the defendant seeking a refund of defendant's contributions to the multi-employer benefits fund made by the defendant from November 1985 until June 1986, approximating $43,000. The defendant believed, erroneously in its present view, that it was obligated to make such payments by the terms of its letter to the union dated November 22, 1985. The relevant facts and court's findings and conclusions are set forth in a memorandum of decision on plaintiffs' claims filed contemporaneously with this order.

---

**12.** The parties have not yet addressed remedial questions.

Upon consideration of the plaintiffs' motion and the parties' contentions,

IT IS ORDERED that the motion be ALLOWED and the defendant's counterclaim be dismissed for failure to state a claim upon which relief can be granted. This result we believe to be mandated by *Dime Coal Company, Inc. v. Combs,* 796 F.2d 394 (11th Cir.1986). That case and those in other circuits, e.g., *South Central UFCW v. C & G Markets, Inc.,* 836 F.2d 221 (5th Cir.1988), hold squarely that ERISA provides no such remedy.

We have also considered whether a refund of payments made under a mistake of fact or law may be recovered on the basis of a federal common-law right of recovery. *Dime Coal,* in footnote 7, ruled that no such common-law right of recovery exists. In *Kwatcher v. Massachusetts Service Employees Pension Fund,* 879 F.2d 957 (1st Cir.1989), where plaintiff was found to have no cause of action under ERISA although 48 years' worth of contributions to a pension fund had been made on his behalf, the appellate court ordered a remand, stating in dicta, at 966, that "federal courts may award restitution to employers in ERISA cases where principles of equity make such an award appropriate." However, such an award in this case would, in our opinion, be highly inappropriate. Here the equities strongly favor the plaintiff Fund, which furnished medical benefits to the covered employees not only during the period when the defendant employer was forwarding ERISA payments to the Fund, but also during the period of approximately ten weeks when the company withheld contributions.

Finally, our conclusion is further supported by *Robbins v. Lynch,* 836 F.2d 330 (7th Cir.1988). There a benefit fund sought and was awarded past due contributions from an employer. The employer counterclaimed for the return of all contributions it had previously made to the fund. Though the Seventh Circuit reached the merits of the counterclaim and we do not, except inferentially in our memorandum of decision finding liability in favor of plaintiffs on their claims, the Seventh Circuit's

reasoning at 836 is equally applicable here: "Given that the funds are entitled to the full contributions called for by the collective bargaining agreement, it follows that [defendant] is not entitled to recoup sums already paid against this obligation."